**ELECTRO–METHODS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 144–85C.

United States Claims Court.

April 18, 1985.

Paul J. Seidman, Washington, D.C., for plaintiff.

Helene M. Goldberg, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

OPINION DISMISSING PLAINTIFF'S COMPLAINT AND DENYING ITS MOTIONS FOR A PERMANENT IN-JUNCTION AND DECLARATORY JUDGMENT

REGINALD W. GIBSON, Judge:

In this pre-award bid protest action, Electro-Methods, Inc. (EMI) seeks multiple injunctive and declaratory relief, the substance of which is to enjoin the defendant (1) from awarding an Air Force contract for the procurement of Part No. 4041874, a 4th Stage Air Seal used in F100 jet engines (the air seal), under Request for Proposal No. F41608–84–R–7400 (the RFP) to any offeror other than plaintiff; (2) from refusing to qualify EMI as an alternate source for the production of the F100 Air Seal; and (3) from the requirement that EMI obtain alternate source approval from Pratt & Whitney (P&W). Additionally, it also seeks a declaratory judgment that the defendant's refusal to qualify EMI as an alternate source for the air seal, and the requirement that EMI obtain approval as an alternative source from its competitor (P&W) was unlawful.[1] Based on the docu-

---

1. Specifically, on March 13, 1985, plaintiff filed its complaint in this court together with an application for a temporary restraining order, and motions for preliminary injunction and expedited discovery. The following day, the court held a status hearing. Inasmuch as the defendant agreed to abstain from awarding the con-tract until after the close of business on April 1, 1985, the date set for the hearing on the motion for a preliminary injunction, the court denied the plaintiff's TRO request as moot and granted its motion for expedited discovery. On March 25, 1985, the court held another status hearing, during which the defendant agreed to abstain

mentary evidence adduced by the parties, the testimony elicited at trial, and the arguments propounded by counsel, the court finds that it is clear beyond cavil that the plaintiff has failed to meet its heavy burden of demonstrating, by clear and convincing evidence, that the Air Force's decision rejecting plaintiff's request for alternate source approval was unreasonable, irrational, or arbitrary and capricious. Jurisdiction is based on 28 U.S.C. § 1491(a)(3).[2]

## FACTS

On April 9, 1984, the Air Force issued a solicitation, Negotiated Request for Proposal No. F41608–84–R–7400 (the solicitation) for 31 (later amended to 35) air seals 4th Stage.[3] Said air seal, part No. 4041374, is an indispensable component in the F100 engine that is used on the F15 and F16 jet fighter aircraft. Such air seal is described as a compressor air seal which prevents air from leaking between certain stages of the engine. We observe, at the outset, that at the top of page 2 of the solicitation, the following legend appears:

THIS SOLICITATION IS RESTRICTED IN ACCORDANCE WITH THE CLAUSE IN SECTION M ENTITLED "RESTRICTIVE ACQUISITION METHOD CODE (AMC) ITEM."

In Section M of the solicitation, which is entitled Evaluation Factors For Award, the RFP emphasizes at Section M–4 that the air seals are a "Restrictive Acquisition Method Code (AMC) Item." Specifically, said solicitation provides that:

M–4. RESTRICTIVE ACQUISITION METHOD CODE (AMC) ITEM:

(a) Under the DOD High Dollar Spare Parts Breakout Program, only the source(s) listed in *paragraph (g)* below have been approved by the Government to supply the item(s) required by this solicitation.

(b) Offers from firms *not* listed in paragraph (g) *may be considered if*:

(1) the offeror submits *prior to or with* its proposal proof of *prior* Department of Defense *approval* as a supplier *of the item(s)*; or

(2) The offeror submits prior to or with its proposal evidence of *having satisfactorily produced the item(s)* for a Department of Defense agency or the *prime equipment manufacturer(s)*; or

(3) *The offeror submits prior* to or *with* its proposal *engineering data (such as* manufacturing controlled drawings, *qualification test reports,* quality assurance procedures, *etc.) sufficient to determine acceptability of the item(s).*

NOTE: This could result in the acceptance of a different part number from that cited in paragraph (g).

from awarding the contract until after the close of business on Friday, April 5, 1985. As a consequence, the court ordered that the motion for a preliminary injunction and the trial on the merits be consolidated in a unitary trial, pursuant to RUSCC 65(a)(2), commencing April 1, 1985. Also, on March 25, 1985, the plaintiff filed its motions for a permanent injunction and a declaratory judgment. At the conclusion of the trial, on April 2, 1985, the defendant further agreed not to award the contract until after the close of business on April 8, 1985, to allow the court time to render its decision.

2. Although this court does not have jurisdiction over the propriety of the Air Force's decision to include a restrictive acquisition method code in the solicitation, which restricted the procurement to approved sources, *see Eagle Construction Corp. v. United States,* 4 Cl.Ct. 470, 476 (1984); *Ingersoll-Rand Co. v. United States,* 2

Cl.Ct. 373, 376 (1983), this court does have jurisdiction to determine whether the bid plaintiff submitted to the Air Force on May 17, 1984, and its request for alternate source approval, was treated fully, fairly and consonant with the terms of the solicitation, the implied contract and applicable regulations. *United States v. Grimberg Company, Inc.,* 702 F.2d 1362, 1367–68 (Fed.Cir.1983); *Standard Manufacturing Co., Inc. v. United States,* 7 Cl.Ct. 54 (1984).

3. The solicitation referred to a *fifth stage* air seal, part number 4041374. The defendant, however, has brought to the court's attention that said part is properly described as a *fourth stage* air seal and that such error caused no harm because all actions were taken with reference to the proper part number, *i.e.,* No. 4041374. The plaintiff has taken no exception to this explanation.

(c) Offers based on submittal of information required by paragraph (b) above will, *as determined by the PCO,* be considered for award under this solicitation *ONLY IF*:

(1) The *Government [PCO] can* determine that *the item(s) will be acceptable*; and

(2) The *Government can* evaluate the submittal, grant approval and award a contract in time to meet the Government's requirements.

\* \* \* \* \* \*

(g) The listing of approved sources and their products below does *not* constitute *a predetermination of responsibility* under DAR 1–900.... (Emphasis added.) [4]

Manufacturers listed in the solicitation in paragraph (g) as approved supply sources were a division of Fabrique Nationale Herstal, United Technologies Corp., of which P&W is a division, and Caval Tool and Machine Co., Inc. Later, Dexter Tool Co. was added to the list of approved sources. These manufacturers were approved by the Air Force because they had previously manufactured the air seal in issue for the prime contractor, P&W, the manufacturer of the F100 jet engine for use in the Air Force's F15 and F16 jet aircraft.

On the same day the solicitation was issued, April 9, 1984, a small synopsis of

the solicitation was also published in the *Commerce Business Daily.* Responding to the solicitation, though *not an approved source,* EMI, on May 17, 1984, submitted to the Air Force at Kelly Air Force Base, Texas, an unsolicited quotation (without any engineering data so as to comply with paragraph (b)(3) of Section M–4 as required), in response to the solicitation, of 31 F100 air seals at $1,330 *each* based on a 60-day after F/A acceptance or 31 pieces at $1,288 *each* based on a 48-week ARO delivery schedule. EMI's price for the air seal was the lowest offered.[5] Shortly thereafter, on June 11, 1984, EMI, seeking to obtain alternate source approval pursuant to paragraph (b)(3) of Section M–4 in the solicitation since it had not been previously approved, submitted to the Air Force a data package for its review. This submission, which by the criterion of paragraph (b)(3) of Section M–4 was more than three weeks delinquent, contained a list of four part numbers that EMI had allegedly "successfully manufactured for [the] Oklahoma City Air Logistics Center [OCALC] under ... referenced contracts." Although EMI stated, in its submittal letter, that the part in issue here, *No. 4041374* was similar to the listed four part numbers EMI had previously manufactured for OCALC, EMI did not represent that it had in fact previously manufactured part No. 4041374 for the Air Force, P&W, or anyone else. In fact, none of the parts listed as similar in plaintiff's

---

**4.** On a weekly basis, standard notes applicable to various solicitations are published in the *Commerce Business Daily.* Note 33 of such notes applied to this solicitation and, essentially, gave a similar notice regarding requirements for alternate source approval for this solicitation. Specifically, Note 33 reads:

33. In accordance with the DOD High Dollar Spare Parts Breakout Program, only the firms who are identified during technical screening as either the prime equipment manufacturer *or as the actual manufacturer of the part being procured have been solicited.* Other offerors proposing to manufacture the part will *not* be considered for award under this solicitation *UNLESS*: (1) the offeror submits prior to or concurrent with its proposal evidence of having satisfactorily produced the required part(s) for the government or the prime equipment manufacturer(s); *OR (2) the offeror submits prior to or concurrent with his*

proposal *such complete and current engineering data for the part(s) (including manufacturing control drawings, qualification test reports, quality assurance procedures, etc.) as may be required for evaluation purposes to determine the acceptability of the part as supplied by your firm for government use....* (Emphasis added.)

**5.** An abstract prepared July 20, 1984, indicated, based on a delivered quantity of 35 items, that the bidders submitted the following bids:

| Contractor | Bid Amount |
| --- | --- |
| Electro Methods | $1,288.00 each |
| Dexter Tool Co. | $1,689.00 each |
| Caval Tool | $1,855.00 each |
| Fabrique Nationale | $1,953.00 each |
| United Tech—P&W ACFT | $2,348.80 each. |

June 11, 1984 request for alternate source approval were parts used in the F100 engine, but rather they were turbine air seals utilized in a totally different jet engine for use on a different airplane. Additionally, the four air seals proffered by plaintiff as "similar" to part No. 4041374 were made from Inconel 901 alloy whereas part No. 4041374 is made out of titanium alloy. Also, none of the parts plaintiff had previously manufactured from titanium were close enough in appearance to part No. 4041374 to, in its judgment, list as a "similar" item in its request for alternate approval. Moreover, the "similarity" theory espoused by plaintiff admittedly related only to "appearance" (Tr. 78 and 106) and shape inasmuch as EMI admitted that it has never made the F100 air seal, part No. 4041374. (Tr. 103.) The data package plaintiff submitted on June 11, 1984, included quality assurance data and drawings, otherwise known as Level III Production Drawings,[6] both of which were prepared by P & W and not EMI, as to each of which the plaintiff *obtained from the Air Force.* The quality assurance program or inspection system that EMI would utilize in manufacturing the part in issue was neither included nor described in the submission nor was it indicated therein whether EMI's intended forging and machinery sources were approved.

Notwithstanding the restricted nature of the solicitation, the Air Force still sought to achieve economic efficiency by utilizing the DOD Replenishment Parts Breakout Program. "The objective of the DOD Re-

plenishment Parts Breakout Program is to reduce costs by 'breakout' of parts for purchase from [entities] other than [the] prime weapon system contractors while maintaining the integrity of the systems and equipment in which the parts are to be used." The program is based on sound management and engineering judgment. 5 GOV'T CONT. REP. (CCH) ¶ 37,490 (1984). In a Supplement to the DOD FAR (DARS No. 6) the DOD Replenishment Parts Breakout Program is established and sets forth the procedures for contracting officers to screen and code parts which will then assist them to identify sources of supply, method of contracting, and other pre-award decisions. *Id.* Once the screening process (technical review) is completed, the part to be procured is assigned an Acquisition Method Code (AMC) and an Acquisition Method Suffix Code (AMSC).[7]

In furtherance of this program as it relates to subject solicitation, the Air Force on or about June 20, 1984, prepared a screening analysis worksheet. On that worksheet, it was indicated that complete data was available (*i.e.,* for manufacturing), that the data rights were not limited, and that the code assigned to the solicitation was 1C. Part 4041374 has been technically restricted since 1973 and was originally given a Q Code. However, when the coding system was updated under the DARS 6, the "Q" Code was reserved, leading the defendant to choose the AMSC C Code for Part 4041374. Under the DOD FAR Supplement, AMC 1 indicates that the

6. Level III Drawings are—
Engineering drawings and associated lists prepared to this Level shall provide engineering definition sufficiently complete to enable a competent manufacturer to produce and maintain quality control of item(s) to the degree that physical and performance characteristics interchangeable with those of the original design are obtained without resorting to *additional product design effort, additional design data, or recourse to the original design activity.* These engineering drawings shall:
  (a) reflect the end-product,
  (b) provide the engineering data for the support of quantity production, and
  (c) in conjunction with other related reprocurement data shall provide the necessary

data to permit competitive procurement ... of items substantially identical to the original item(s)....
See Plaintiff's Exhibit 11.

7. An acquisition method code is a numerical code assigned by the DOD activity, to describe the results of a technical review of a part. S6–103.1. See 5 GOV'T CONT.REP. (CCH) ¶ 37,491 (1984). An *acquisition method suffix code* is an alpha code assigned by the DOD activity, which further describes the Acquisition Method Code by adding information concerning the status of a part in areas such as engineering, manufacturing, and technical data. S6–103.2. *Id.*

part is suitable for competitive acquisition. However, the AMSC C Code indicates that the:

... *part requires engineering source approval by the design control activity in order to maintain the quality of the part. An alternate source must qualify in accordance with the design control activity's procedures,* as approved by the cognizant Government engineering activity.... (Emphasis added.)

5 GOV'T CONT. REP. (CCH) ¶ 37,500 (1984). In this regard, P & W, the manufacturer of the F100 engine, was the design control activity for the air seal. P & W was also competing to supply the air seal through its parent, United Technologies. Unfortunate for the plaintiff, as of at least June 24, 1983, it did not maintain an amicable business relationship with P & W, and plaintiff did not clearly develop on the record the true origin of the problem.

An AMSC G Code indicates that the government has unlimited rights to the technical data, and the data package is complete. However, the screening analysis worksheet justified the use of the "C" suffix code, rather than the "G" suffix code, on the basis that "Engineering and Evaluation/approval of alternate source is necessary to assure [that] quality parts are produced." In the notes to the worksheet, it was highlighted that the item (the air seal) contained critical characteristics and critical life characteristics and "must be 100% inspected."

Critical life characteristics (CLC) is a term that originated with P & W and is unique to the component parts in the F100 engine. P & W uses CLC to flag the attention of the manufacturer of component parts to the fact that those particular characteristics of a part require its utmost attention and that it cannot deviate from the design without significantly shortening the useful life of the part. However, the concept of CLC engendered from the Air Force's request to P & W, because of the severe problems the Air Force was encountering with the F100 engine parts, to come up with a quality assurance document that

would alert and sensitize manufacturers to the criticality of the problems. (Tr. 132, 353.)

Given the rather sterile submission contained in plaintiff's request for alternate source approval on June 11, 1984, in a July 12, 1984 telex, the contracting officer rejected EMI's request for an alternative source approval on part No. 4041374, stating as its grounds that "THE ENGINEERS HAVE DETERMINED THAT SIMILARITY IS NOT ACCEPTABLE EVIDENCE OF CAPABILITY TO PRODUCE THIS PART WHICH HAS CRITICAL LIFE CHARACTERISTICS (CLC) REQUIREMENTS."

Soon after receiving notice of the contracting officer's rejection, *supra*, EMI filed a protest with the GAO on July 19, 1984, against an award of the subject contract to any firm other than itself, and also objected to the Air Force's refusal to approve EMI as an alternate source. In that protest, EMI averred that the Air Force's determination was improper because it was without a rational basis as it related to the minimum needs of the government. Additionally, EMI argued that because it was a small business, the contracting officer may not, under 15 U.S.C. § 637(b), preclude it from qualifying on grounds of capability or reject its offer without referring the matter to SBA for final determination under its certificate of competency program.

Subsequently, in early August of 1984, J.H. Work, the contracting officer, sent a more detailed explanation to EMI reflecting the reasoned basis of the Air Force's rejection of plaintiff's request for alternate source approval. First, the letter advised that the Air Force's engineers used Air Force Regulation 57–2 as a guideline in evaluating the data EMI submitted for alternate source approval. Second, Mr. Work stated that the air seal was a technically restricted part, *i.e.*:

"This mean[t] that it [was] an aircraft engine component that the responsible engineering activity ha[d] determined require[d] special controls during manufacture or acceptance."

Thus, as brought out in Section M–4 of the solicitation, the part was "assigned a restrictive acquisition method code" and "was not open to competitive procurement." EMI was further advised that the part could only be procured "from sources that have qualified their parts in the engine in which the part [was] to be used." The letter continued that:

"3. ... it was impossible for [the Air Force] engineer's [sic] to qualify EMI as an alternate source for this item based on its manufacture of a *similar* item or items.

4. You *may* pursue your qualification efforts for this item by contracting [sic] the Prime Manufacturer, United Technologies, Pratt & Whitney, Acft MFC 77445. Should you become qualified in this manner, the Air Force will be happy to receive your proposal for future acquisitions of this part." (Emphasis added.)

On March 11, 1985, the GAO issued its opinion denying EMI's protest in which it concluded that the Air Force's determination that EMI's submission was technically unacceptable was not a responsibility determination which was required to be referred to the SBA. The GAO also concluded that the Air Force's technical determination, that the product must be tested for use in the engine for which it was made and that neither the data submitted by EMI nor the fact that EMI had made "similar" items was sufficient to qualify EMI as an approved source, was reasonable to support the rejection of EMI's bid. Finally, the GAO found that EMI's failure to obtain P & W's approval because of its inability to redevelop a business relationship with P & W was a matter between private parties which could not be adjudicated by the GAO. Thereafter, the plaintiff filed its complaint with this court on March 13, 1985.

## DISCUSSION

Before this court, EMI contends, *inter alia*, that the contracting officer's refusal to qualify EMI as an alternate source supplier for the air seal lacked a rational basis,

violates applicable procurement statutes and regulations, and that the requirement that P & W approve EMI as a supplier unduly restricts competition. Additionally, EMI continues to argue that the contracting officer's rejection of EMI, as an alternate source, was a negative responsibility determination which must be forwarded to the SBA for a certificate of competency. Further, EMI argues that P & W's discretionary power to approve or disapprove sources for the F100 air seal is an organizational conflict of interest. Contrastingly, the defendant argues, *inter alia*, that the plaintiff has not met its heavy burden of proof, *i.e.*, by clear and convincing evidence, that the Air Force's rejection of EMI, as an alternate source, lacked a rational basis sufficient to satisfy the requirement for the grant of an extraordinary injunctive remedy.

The gravamen of plaintiff's contention, that the defendant's decision lacked a rational basis, is that EMI has demonstrated on two different bases that it duly qualifies as an alternate source for the procurement of the air seal. EMI's first basis for approval was that it submitted to the Air Force Quality Assurance Data (QAD) Sheets and Production Level III Drawings, prepared by P & W pursuant to its contract with the Air Force, that were required to be "sufficiently complete to enable a *competent manufacturer* to produce and maintain quality control of item(s) to the degree that *physical and performance characteristics* interchangeable with those of the original design *are obtained without resorting to additional product design effort*, additional design data or recourse to the original design activity." (Emphasis added.) Because, EMI argues, it is a competent manufacturer, and the Air Force does not deny that fact, then *a fortiori* EMI has demonstrated that it could produce an acceptable air seal, based on the manufacturing and quality assurance data submitted even though said data was prepared by and is the engineering data of P & W. EMI's second basis asserted for alternate source approval was premised on the grounds of "similarity," *i.e.*, since EMI

submitted to the Air Force a list of parts that it had previously produced for Tinker Air Force Base that it believed were substantially identical or similar to part No. 4041374 in issue, such fact was conclusively probative that it could and would manufacture an acceptable part under subject solicitation. Rather than approve EMI on either of these grounds, the Air Force, EMI argues, ignored the evaluation criteria of the solicitation (M–4(b)(3)) and rejected EMI's proposal relying on internal policy AFR 57–2 which does not have the force and effect of law.

Paragraphs (b)(1) and (2) of Section M–4 of the solicitation clearly permits a contractor to qualify under this restrictive procurement if it has either previously been approved as a supplier by the Department of Defense (DOD) or proof is submitted that it has previously satisfactorily produced part No. 4041374 for the DOD or for the prime manufacturer, *i.e.*, in this case P & W. Plaintiff seeks to qualify here, on neither of the foregoing grounds because it admits that it has never made an F100 Air Seal (Tr. 103). Instead, plaintiff seeks qualification on the hypothesis that since it has made the four turbinal air seals for Tinker Air Force Base (although used in a jet engine other than the F100) and by "... appearance ... they are identical" although dimensionally they differ (Tr. 78), they are nevertheless "extremely similar" to the air seal in issue (No. 4041374) (Tr. 47). Therefore, plaintiff contends its submission was, *ipso facto*, sufficient to require the defendant (Kelly Air Force Base) to determine its acceptability of the item as contemplated by the solicitation.

■ We begin our initial legal analysis by observing that judicial review of an agency's pre-award procurement decision is and should be extremely limited in scope. *Baird Corporation v. United States*, 1 Cl.Ct. 662, 664 (1983). And, when the procurement involves national security or national defense interests, the court is constrained to give due regard to those considerations in exercising its jurisdiction. 28 U.S.C. § 1491(a)(3). Additionally, the court

should not substitute its judgment as to the propriety of such matters for that of the agency but should intervene only where the aggrieved bidder has demonstrated, by clear and convincing evidence, that the agency's determination was irrational or unreasonable, *Baird* at 664, or that the decision was made in clear and prejudicial violation of applicable statutes and regulations. *DeMat Air, Inc. v. United States*, 2 Cl.Ct. 197, 202 (1983).

■ As noted in *DeMat Air*, 2 Cl.Ct. at 202, contracting officers may appropriately exercise wide discretion in their evaluation of bids and their application of procurement regulations. *Id.* In negotiated procurements in particular, such as obtains here, procurement officials are allowed wider discretion than that allowed in an advertised procurement. *Id.* at 202. Moreover, where an agency's decisions are highly technical in nature, such as here, judicial restraint is appropriate and proper. *Isometrics v. United States*, 5 Cl.Ct. 420, 423 (1984). For example, and pertinent to the issue here, the Supreme Court has noted that this is particularly true:

... when we consider a purely *factual question* within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on "engineering and scientific" considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis *unless it is without substantial basis in fact.* (Emphasis added.)

*FPC v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 644, 30 L.Ed.2d 600 *reh. denied*, 405 U.S. 948, 92 S.Ct. 929, 30 L.Ed.2d 819 (1972).

Also noteworthy here is the legislative history of the Federal Courts Improvement Act of 1982 that teaches us that Congress intended that "... the Government must be permitted to exercise its right to conduct business with those suppliers it selects and to do so in an expeditious manner," and that this court should utilize its authority conferred upon it by 28 U.S.C. § 1491(a)(3) "*only* in circumstances where the contract,

if awarded, would be the result of arbitrary or capricious action by the contracting officials to deny qualified firms the opportunity to compete fairly for the procurement award." See S.REP. No. 97–275, 97th Cong., 1st Sess. 23, *reprinted in* 1982 U.S. CODE CONG. & AD.NEWS 11, 33. Last, but not least, is the admonishment that this "court [must] take care not to delay or prevent the award of contracts for goods ... which relate to national defense or security." *Id.*

## ISSUES

Framed in the light of the standards and guidelines set forth above, the broad dispositive issues before the court, therefore, are:

(1) whether the contracting officer's decision to reject EMI as an alternate source for the air seal lacked a rational basis or was in clear violation of applicable statutes and regulations; and

(2) whether such rejection was a determination of responsibility that should have been referred to the SBA pursuant to 15 U.S.C. § 637(b)(7).

■ The Air Force found that the submitted Production Level III drawings and QAD data by EMI on June 11, 1984, together with EMI's history of producing "similar" air seals for the Air Force (*i.e.*, for jet engines other than the F100) was insufficient to qualify EMI as an alternate source in that they did not enable the contracting officer to "determine acceptability of the item."[8] Given said decision, and based on the overwhelming evidence in the record, this court cannot find it to be either irrational or in violation of applicable statutes or regulations.

The threshold focus of this court in determining whether the contracting officer's decision was rational and reasonable requires us to keep in mind first and fore-most that the criticality of part No. 4041374 is manifest in the fact that the air seal is an indispensable component of the F100 engine which propels the F15 and F16 jet aircraft, our nation's primary fighter planes. More importantly, it should be observed that the F16 is a *single-engine plane,* and in the event of an in-flight engine failure resulting from defects in the air seal in issue, the plane, valued at $21 million, can be expected to crash. It is further emphasized per the testimony adduced at trial through *Mr. Judson,* in response to the court's questions, that if the so-called "similar" air seals identified in EMI's request for alternate source approval, were to be inserted in the F100 engine "[i]t wouldn't work" because "[t]hey're not interchangeable," the engine would not run, and if it were a one-engine F16 "it wouldn't fly." (Tr. 119.) Additionally, if the air seal fails in the F15, a two-engine plane, the plane can be expected to have a non-recoverable in-flight shutdown.

Against this background, any notion that the contracting officer's decision was unreasonable and/or irrational is thoroughly misplaced when the foregoing probative facts are coupled with the startling facts that—(i) the plaintiff has never manufactured part No. 4041374 whereas all of the manufacturers approved as sources for the air seal had actually previously produced this part for the prime manufacturer and have had the part they produced used in the F100 engine; (ii) none of the parts listed by EMI as "similar" to part No. 4041374 were F100 engine parts; (iii) nor were those parts air seals made of titanium of which the air seal in issue here is made.

The operative facts also show that the contracting officer's determination was consistent with and furthered the thrust of the applicable regulations. For example, section 217.7203 of the DOD FAR Supplement (referred to as § 17.7203 in the tran-

---

8. The record shows that with regard to an unrelated procurement prior to 1984, EMI was required and did submit certain production samples to Kelly Air Force Base. Mr. Judson, EMI's Product Development Manager who is responsible for all contractual arrangements with the military, testified that following said submission they did not obtain approval of the samples. (Tr. 97 and 98.) This circumstance obviously favorably underscores the rationality and the reasonableness of the contracting officer's decision in subject case.

script), that pertains to the Department of Defense's procurement of parts, provides that:

(a) *Any part,* subassembly, or component (hereinafter called "part") for *military equipment, to be used for replenishment of stock, repair, or replacement, must be procured so as to assure the requisite safe, dependable, and effective operation of the equipment. Where it is feasible to do so without impairing this assurance, parts should be procured on a competitive basis,* as in the kind of cases described in (b) below. However, *where this assurance can be had only if the parts are procured from the original manufacturer of the equipment* or his supplier, the procurement should be *restricted accordingly, as in the kind of cases described in (c) below.*

(b) Parts that are fully identified and can be obtained from a number of known sources, and parts for which fully adequate manufacturing drawings and any other needed data are available with the right to use for procurement purposes (or can be made so available in keeping with the policies in FAR Part 27 are to be procured on a competitive basis. In general, such parts are of a standard design configuration. They include individual items that are susceptible of separate procurement, such as resistors, transformers, generators, spark plugs, electron tubes, or other parts having commercial equivalents.

(c) *Parts not within the scope of (b) above generally should be procured* (either directly or indirectly) *only from sources that have satisfactorily manufactured or furnished such parts in the past, unless fully adequate data (including any necessary data developed at private expense), test results, and quality assurance procedures, are available with the right to use for procurement purposes (or can reasonably be made so available in keeping with the policies in FAR Part 27 to assure the requisite reliability and interchangeability of the parts, and acquisi-*

*tion on a competitive basis would be consistent with the assurance described in (a) above. In assessing this assurance, the nature and function of the equipment of which the part is needed should be considered.* Parts qualifying under this criteria are normally sole source or source controlled parts (see MILSTD 100) which exclusively provide the performance, installation and interchangeability characteristics required for specific critical applications. To illustrate, acceptable tolerances for a commercial television part may be far less stringent than those for a comparable military radar part, permitting competitive contracting for the former but not for the latter. *The exacting performance requirements of specially designed military equipment may demand that parts be closely controlled and have proven capabilities of precise integration with the system in which they operate, to a degree that precludes the use of even apparently identical parts from new sources, since the functioning of the whole may depend on latent characteristics of each part which are not definitely known.* (Emphasis added.)

48 C.F.R. § 217.7203 (1984).

Essentially, since part No. 4041374 was not within the scope of paragraph (b) above, because "other needed data [was *not*] available" to the contracting officer, it therefore could only be procured one of two ways. First, it could have been procured (directly or indirectly) from a source that had manufactured or furnished it in the past. EMI was clearly not such a source, as even itself admits that it has never manufactured part No. 4041374. Alternatively, if *"fully adequate data* (including any necessary data developed at private expense), *test results, and quality assurance procedures* [were] *available* with the right to use for procurement purposes," then part No. 4041374 could have been procured from a manufacturer that had supplied such information. (Emphasis added.) This is assuming, of course, that the submission establishes that the part

has "proven capabilities of precise integration with the system in which [it] operate[s]" and there is indeed a reasonable assurance that the unit can be safely and dependably operated. Thus, EMI could only obtain alternate source approval if it had provided adequate data as delineated in paragraph (c) of § 217.7203 of the regulations.

Comparatively, the requirements of the DOD FAR Supplement § 217.7203 for manufacturers who had not previously produced part No. 4041374 were also consistent with the alternate source approval requirements listed in Section M–4(b)(3) of the solicitation pursuant to which EMI attempted to obtain approval. Section M–4(b)(3) of the solicitation required the offerors to submit "prior to or with its proposal engineering data (such as manufacturing controlled drawings, qualification test reports, quality assurance procedures, etc.) sufficient to determine acceptability of the item(s)." See also Note 33 in footnote 4.

In spite of the clearly delineated criteria for such approval, *supra*, EMI only submitted, notwithstanding the solicitation requirement of M–4(b)(3), Note 33, and 48 C.F.R. § 217.7203, Production Level III drawings and QAD sheets prepared by the prime manufacturer, P & W, together with a list of numbered air seal parts which it had manufactured for a different engine and which were made out of material alien to that required for part No. 4041374. EMI also failed to submit required test results. Nor did it submit process sheets which even its own representative testified were important to determine the acceptability of the part.[9] Also, and equally significant is the fact that EMI did not indicate from whom its forgings would be obtained, again another critical element which its own representative testified was important to examine.

Moreover, in addition to a patent deficiency in the documentary proof submitted, *supra*, the testimony adduced at trial clearly demonstrates that the Air Force was also justified in finding a lack of adequate data so as to preclude qualifying EMI as an alternate source. The contracting officer, Mr. Work, testified that when he wrote EMI the letter dated August 3, 1984, detailing the basis of the defendant's rejection, he relied on the "engineer's advice that the data wasn't adequate," and that EMI was not an approved source. That engineer was Mr. Copeland. Mr. Work also testified that it was the engineer's responsibility to assign the procured part an acquisition code and to determine if the documentation and the data were sufficient to allow the Air Force to determine the acceptability of a part. Additionally, Mr. Work testified that the engineer relied on § 217.7203 of DOD FAR Supplement (or its predecessor provision in the DAR that was substantially identical) in making his disapproval determination.

Mr. Copeland, an engineer for the Air Force who was responsible for approving sources for components of the F100 engine, testified that he was not familiar with the terms of the solicitation but that he made the decision not to qualify EMI for alternate source approval based on the requirements of AFR 57–2. Specifically, Mr. Copeland testified that he deemed EMI's source approval package not to contain adequate data as prescribed in DOD FAR Supplement § 217.7203(c) because it did not submit test results, part samples, or evidence that EMI had previously manufactured the part (Tr. 197). Even though Level III drawings were available, Mr. Copeland testified that more was needed to assure that the Air Force was buying a part that met its requirements. Also, Mr. Copeland could not tell from EMI's submission package from what source it was obtaining

---

**9.** Mr. Wilson, EMI's marketing engineer, explained at the trial that process sheets are prepared by the production process planners who reduce the dimensioning on the part to operational sequences with the material specified so that shop people who operate the machinery, and cannot read engineering drawings, can understand how the part is to be processed. In other words, drawings, such as those which EMI submitted, show only what the final product is supposed to look like whereas the process sheets tell you how to perform the task.

its forgings or by what method EMI intended to produce the part. Further, Mr. Copeland stated that similarity to other parts was not acceptable for proof of capability for the manufacture of an F100 engine part that is restricted.

AFR 57–2 is an internal procedure binding on the Air Force that is entitled "Joint Procedures for the Qualification and Acceptance of Aircraft Engine Parts from Alternative Sources of Supply." Its preamble reads that it is a "regulation [that] establishes a joint method of qualifying sources of supply of aircraft engine parts which are designated technically restricted." The "policy" of AFR 57–2 indicates that:

Parts determined by the Government to be technically restricted as defined above are not subject to open competitive procurement. *These parts are procured only from sources that have qualified their parts in the engine in which the parts are to be used....* In *certain cases, the Government may consider evidence other than an engine test as suitable verification of part qualify without requiring a formal test demonstration.* For instance, evidence submitted of the satisfactory use of a part in a military or domestic commercial airline could be accepted as demonstrating satisfactory performance, dependent on the specific part in question. The responsible engineering activity supporting the procuring activity will make a determination of the adequacy in this approach.... Generally, it is not feasible for the Government to either provide engines

for, or to conduct alternate source qualification engine tests. Neither does the Government have the technical manpower, facility resources, or the funds that would be needed to afford equal opportunity in all cases to all interested manufacturers of such parts. (Emphasis added.)

The "procedures" delineated in AFR 57–2 indicate that:

Those parts that have been identified as technically restricted will require *qualification or substantiation testing similar to those tests required of the original manufacturer of the engine.*[10] Where a contractor desires to qualify to manufacture a technically restricted part, he shall make arrangements with the responsible Government engineering activity for definition of a suitable substantiation test procedure, and review of these tests by the Government.... (Emphasis added.)

Mr. Joseph Best, who is Mr. Copeland's supervisor and works as an engineering supervisor for the F100 engine, testified that he reviewed EMI's package for about a minute to check Mr. Copeland's decision to deny EMI's request for source approval. Mr. Best's review was so short, he testified, because he immediately judged from EMI's package that "the main ingredients were missing." EMI's package failed to contain qualification test requirements or sample parts. These were essential elements and there was no indication that they were going to be offered. With regard to the requirements of DOD FAR Supplement § 217.7203(c), Mr. Best also

10. Under this solicitation, the original manufacturer of the engine is Pratt & Whitney. At the trial, Mr. Kappert, the engineering manager of F100 engine projects for P & W, testified that P & W conducts engineering source approval for part No. 4041374 pursuant to a specification entitled P & W 370 which was approved by the Air Force in August of 1981. Pursuant to P & W 370, similarity is only allowed to qualify suppliers of the fourth stage air seal (part No. 4041374) if that supplier had already been qualified on the fifth stage air seal. This is so because the fourth and fifth stage air seals are both used in the same F100 engine, made out of titanium and operate in a similar environment

which is a 12,800 rotational speed in a temperature of 400 to 500 degrees Fahrenheit.

Mr. Kappert also testified that P & W does require an engine test to approve an engineering source for part No. 4041374 *if* its forging supplier was *not* source approved. However, if the forging supplier *is* source approved, and the machining supplier says he will go to that approved source, then an engine test is not required but a lengthy laboratory test is mandated. It was not disclosed at trial how any of the approved sources who have manufactured the air seal initially obtained source approval from Pratt & Whitney.

testified that EMI's package did not meet the requirements of that regulation, *i.e.*, it did not contain test results or quality assurance procedures. (Tr. 340–341.)

Significantly, Mr. Best also testified that the Air Force has had at least 11 recent air seal failures on the F100 engine, three of which resulted in class "A" (loss of the aircraft) mishaps. And, in connection with the engine testing requirement, Mr. Best stated that:

> ... as a last resort to make sure that you don't subject that ... engine [sic] which may have some young fellow strapped to it in an aircraft, you do engine tests and engine tests is a viable option. It's mentioned in our Air Force Reg 57–2 and a test is mentioned in DAR supplement 6, and engine test is mentioned in MIL standard 1529. MIL Standard 1529 is the document that production design group is supposed to be working to. The DAR supplement 6 and Air Force Reg 57–2 are the documents that my engineering types are supposed to be working to.
>
> All I can say is *it's engineering judgment* and as far as I'm concerned it's accepted engineering judgment and is *sanctioned* by these documents. *It's recognized as being a viable option and I think if we completely ignored it we would be subject to criticism that we hadn't taken that precautions [sic] on these very critical parts.* (Emphasis added.)

He did note, however, that *if* EMI had advised that its forgings would come from an approved source, he would *not* have required them to do an engine test, but EMI did *not* inform the Air Force from whom it was buying its forgings.

Although, as plaintiff avers and defendant acknowledges, AFR 57–2 is an internal instruction of the Air Force without the force and effect of law, its requirements for engine testing or testing similar to the original manufacturer (P & W) is not inconsistent with the mandates of the Section M–4(b)(3) solicitation requirements, Note 33, or the requirements of "adequate data"

delineated in § 217.7203(c) of the DOD FAR Supplement. In all of these documents, qualification "test reports" or "test results" were required. EMI failed to include such test reports in its submittal for alternate source approval and both Mr. Copeland and Mr. Best testified that the requirements of § 217.7203(c), which does have the force and effect of law, were therefore not satisfied by EMI. Obviously, the solicitation and applicable regulations envisioned some sort of testing to enable a manufacturer to obtain source approval. When no such test results or samples to perform tests upon are supplied to the Air Force in a request for source approval, the contracting officer, who rested his adverse judgment on the advice of professional engineers, cannot be held to have acted irrationally, unreasonably, or in violation of statutes and regulations in view of the plethora of probative evidence to the contrary. In fact, this court agrees with counsel for defendant that a contrary decision by the contracting officer, in the face of the overwhelming evidence adverse to EMI, would have been irrational.

Moreover, this court is constrained to find that the contracting officer's decision is especially compelling in light of the following revelation from General Farrington, Vice-Commander of the San Antonio Air Logistics Center:

> THE COURT: Without divulging any defense secrets insofar as the utilization of the F–15 and the F–16, would you kindly state for the record how important the F–15s and F–16s are for national defense and national security?
>
> THE WITNESS: *The F–15 and the F–16 are our front line fighter planes. They are, at this point, absolutely key to our ability to fulfill the requirements of our war plans. They are the mainstay of both our air-to-air ... superiority fighters and our air-to-ground weapons systems. They are an absolute integral part of the NATO system and of our world-wide deployable capability for fighter aircraft, in both the air to ground and the air to air*

*role. Of course it's important to us because they are the only aircraft we have which are capable of meeting the threat of the most high performance fighters of our adversaries.* (Emphasis added.)

In summary, the cumulative nature of the testimony and the documentary evidence adduced at trial ' unequivocally proves that the Air Force's rejection of plaintiff as an alternate source, either on the basis of similarity or on the data package submitted, was rational and consistent with applicable laws and regulations, thus warranting no intrusion by this court. Under EMI's espoused grounds of similarity as a basis for entitlement to alternate source approval, nowhere is it cited in the solicitation or regulations that similarity of products is, *ipso facto,* enough for a manufacturer to obtain approval as a supplier of a restricted critical part. It is not surprising that plaintiff's counsel cites this court to no relevant and binding authorities on this point. Additionally, the so-called "similar" seals plaintiff has previously manufactured for the Air Force are markedly distinguishable from part No. 4041374 by the materials used (titanium vs. Inconel), dimensions, weight, the engine model in which they are incorporated, the manner by which they are machined, and the outside tests required to prevent cracking. Besides, under the submitted data package basis, plaintiff's proof also falls short of its heavy burden necessary to entitle it to injunctive relief. Said data was thoroughly deficient in that it did not—contain quality test reports, process sheets, part samples, explain EMI's inspection system, or indicate where EMI would obtain its forgings from or if such forging source was approved by the defendant.

As compared to the other approved sources, the record shows that plaintiff has never manufactured part No. 4041374 whereas all of the approved manufacturers for the air seal had actually previously produced this part for the prime manufacturer.

■ Finally, plaintiff's counsel's argument—that even assuming that EMI's proposal was deficient, "[the deficiencies] should have been pointed out to Electro-Methods, since it's a negotiated procurement and they should have been given the opportunity to correct it"—does not cut the muster, given the requirements delineated in the applicable regulations. For example, pursuant to the FAR, under a competitive negotiated procurement, the contracting officer is required to:

"... conduct written or oral discussion with all responsible offerors who submit proposals within the competitive range. The content and extent of the discussions is a matter of the contracting officer's judgment based on the particular facts of each [procurement]. . . .

The contracting officer shall—

(1) Control all discussions;

(2) Advise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements;

(3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;

\*     \*     \*     \*     \*     \*

(5) Provide the offeror a reasonable opportunity to submit any cost or price, technical, or other revisions to its proposal that may result from the discussions.

*... The contracting officer and other Government personnel* involved *shall not engage in —*

(1) *Technical leveling (i.e., helping an offeror to bring its proposal up to the level of other proposals through successive rounds of discussion, such as by pointing out weaknesses resulting from the offeror's lack of diligence,* competence or inventiveness in preparing the proposal);

(2) Technical *transfusion (i.e., Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal)* ; ..."

48 C.F.R. § 15.610 (1984). (Emphasis added.)

The court finds, based on the notice given to EMI via the defendant's telex of July 12, 1984, and its more detailed letter on or about August 3, 1984, that collectively they satisfy the above regulatory requirement(s). Certainly, it was not necessary for the Air Force to spoon-feed EMI up to the level of responsiveness required to obtain alternate source approval. *See Southwest Marine, Inc. v. United States*, 3 Cl.Ct. 611 (1983); *Prudential-Maryland Joint Venture Co. v. Lehman*, 590 F.Supp. 1390, 1408 (D.D.C.1984).

■ Turning now to plaintiff's contention that the Air Force's decision should have been referred to the SBA pursuant to 15 U.S.C. § 637(b)(7)(A) (1982),[11] the court agrees with the defendant that its decision dealt with EMI's technical responsiveness and thus the question of responsibility was never reached by the Air Force. The Small Business Act, as amended, 15 U.S.C. § 637(b)(7)(A) (1982), requires a contracting officer's finding that a small business is not responsible in order to be referred to the SBA, which will conclusively resolve the matter by issuing or refusing to issue a certificate of competency.

However, as stated by the GAO:

Responsiveness is a term generally associated with formally advertised procurements; it is occasionally used in connection with negotiated procurements ... to denote a material requirement. [Citation omitted.] Responsiveness refers to the bidder's or offeror's unconditional agreement to supply precisely what is called for in a solicitation. Responsibility, on the other hand, refers to the bidder's or

offeror's ability to do so; it includes financial status, experience, and the like. *Pacific Sky Supply, Inc.*, B–215189, January 18, 1985, 85–1 C.P.D. ¶ 53 at 7; *see also Heli-Jet Corp. v. United States*, 2 Cl.Ct. 613, 620 (1983); *Essex Electro Engineers, Inc. v. United States*, 3 Cl.Ct. 277, 283 n. 8 (1983).

The terms of the solicitation itself provided, with regard to those manufacturers who were approved, that "[t]he listing of approved sources and their products ... does *not* constitute a predetermination of *responsibility....*" (Emphasis added.) Thus, if the sources that were approved had not yet withstood the test of responsibility, *a fortiori*, EMI, who was trying to obtain source approval, also had not yet been subject to a "responsibility" evaluation. Responsibility was a second step of the test and plaintiff never got beyond the first step. This conclusion is further buttressed by the presence of section L–21 in the solicitation entitled Pre-Award Survey of Prospective Contractor which addresses "responsibility" evaluations *if* an offeror's response is favorably considered. There, at least 13 evaluating factors are listed in this section which include technical capability, production capability, plant facilities and equipment, financial capability, quality assurance, plant safety, labor resources, performance results and ability to meet delivery schedules.

It is apparent that section M of the solicitation addressed technical responsiveness, and section L–21 addressed responsibility. In light of the foregoing, this court agrees with the Comptroller General's decisions that when a contracting officer determines that an offeror is technically unacceptable, the question of responsibility is not involved and therefore the SBA Act does not

**11.** 15 U.S.C. § 637(b) (1982) provides that:
It shall ... be the duty of the Administration ... whenever it determines such action is necessary—

     *   *   *   *   *   *

    (7)(A) To certify to Government procurement officers, ... with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small

business concern or group of such concerns to receive and perform a specific Government contract. A Government procurement officer ... may not, for any reason specified in the preceding sentence, preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the Administration.

apply. *Pacific Sky Supply, Inc.,* B–215189, January 18, 1985, 85–1 C.P.D. ¶ 53; *Rogar Manufacturing Corp.,* B–214110, April 25, 1984, 84–1 C.P.D. ¶ 479; *Advanced Electro Magnetics, Inc.,* B–208271, April 5, 1983, 83–1 C.P.D. ¶ 360.

To the extent that plaintiff has raised arguments concerning its ability to get approval from P & W itself, because of some unexplained personal strife, those arguments need only be briefly addressed by the court. The heart of the contracting officer's decision was that "it was impossible for the [Air Force] engineer's [sic] to qualify EMI as an alternate source for [part 4041374] based on [EMI's] manufacture of a similar item" or on the data package submitted. The contracting officer's statement that EMI *may* (and not must) pursue its qualification efforts for this item by contacting P & W was a suggestion to allow plaintiff to obtain approval under an alternative method. We do not read the contracting officer's suggestion to contact P & W to be a prerequisite to the obtainment of the Air Force's approval. Thus, despite plaintiff's persistent representations in its briefs that EMI was required to get approval from P & W and that such requirement created a conflict of interest, *see* 48 C.F.R. §§ 9.501–9.509 (1984), the court finds no such mandatory requirement was proven and that plaintiff failed to obtain alternate source approval because of its failure to meet the Air Force's requirements, independent of P & W's approval. Although plaintiff urges the court to recognize that it was impossible for EMI to obtain P & W's approval because of the "bad blood" between the two companies, there was, as EMI admits, no legal impediment preventing EMI from going to P & W. The "bad blood," as the GAO brought out, was a matter between two private parties, and thus we agree it is not a matter within this court's jurisdiction. *See generally, National City Bank of Evansville v. United States,* 143 Ct.Cl. 154, 164, 163 F.Supp. 846, 852 (1958).

Lastly, plaintiff's contention that the defendant unduly restricted competition by requiring a cost-prohibitive engine test is also unpersuasive. The record clearly demonstrates that had EMI submitted test results, process sheets, and part samples along with an indication that it was obtaining its forgings from an approved source, the Air Force would *not* have required an engine test. And, EMI's argument that the defendant's decision violates sound procurement policy and was not in the public interest is totally absurd in light of the critical nature of the air seal, the vital role the F15 and F16 aircraft play in our nation's defense and EMI's insufficient demonstration to the defendant that it could satisfactorily produce the air seal.

### CONCLUSION

Based on the foregoing, plaintiff's motions for injunctive relief and declaratory judgment are denied. The Clerk shall, therefore, dismiss the complaint.

IT IS SO ORDERED.