# In the United States Court of Federal Claims

Nos. 13-87 C & 13-91 C

(Filed May 6, 2013)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | * | |
| CGS ADMINISTRATORS, LLC, | * | |
| and PALMETTO GBA, LLC, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Post-Award Bid Protest; Best |
| | * | Value Award Not Shown To Be |
| THE UNITED STATES, | * | Arbitrary, Capricious, an Abuse |
| | * | of Discretion, or Contrary to |
| Defendant, | * | Law. |
| | * | |
| NORIDIAN ADMINISTRATIVE | * | |
| SERVICES, LLC, | * | |
| | * | |
| Intervenor-defendant. | * | |
| * * * * * * * * * * * * * * * | * | |

Craig A. Holman, Washington, DC, for plaintiff CGS Administrators, LLC. Kara L. Daniels, Michael E. Ginsberg, William S. Speros, and Dana E. Peterson, Washington, DC, of counsel.

W. Jay DeVecchio, Washington, DC, for plaintiff Palmetto GBA, LLC. Daniel E. Chudd, Kevin C. Dwyer, Edward Jackson, Ethan E. Marsh, and Adam G. Unikowsky, Washington, DC, of counsel.

---

[1] This opinion was issued under seal on April 17, 2013. Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Brackets ([ ]) identify the redacted portions of this opinion.

*Tara K. Hogan* and *Alexis J. Echols*, United States Department of Justice, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director, Washington, DC, for defendant. *Brian Hildebrandt* and *Christian Maimone*, Office of General Counsel, United States Department of Health and Human Services, Baltimore, MD, of counsel.

*Paul F. Khoury*, Washington, DC, for intervenor-defendant. *Daniel P. Graham*, *Kathryn Bucher*, *Tracye Winfrey Howard*, *Brian G. Walsh*, *Craig Smith*, and *Katherine R. McDonald*, Washington, DC, of counsel.

_____

**OPINION AND ORDER**
_____

**Bush**, *Judge*.

This post-award bid protest is before the court on cross-motions for judgment on the administrative record filed under Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC). CGS Administrators, LLC (CGS) and Palmetto GBA, LLC (Palmetto) challenge the award of Contract No. HHSM-500-2012-M0012Z to Noridian Administrative Services, LLC (Noridian) by the Centers for Medicare and Medicaid Services, United States Department of Health and Human Services (CMS or agency). Plaintiffs' complaints were filed on February 1, 2013 and the two cases were consolidated on February 5, 2013. An administrative record (AR) was filed on February 8, 2013 and was subsequently corrected and amended on February 14, 2013 and February 21, 2013. The parties' cross-motions have been fully briefed according to an expedited briefing schedule; oral argument (Tr.) was held on April 2, 2013. For the reasons discussed below, plaintiffs' motions are denied and the government's and Noridian's motions are granted.[2]

_____

[2] This opinion reviews a massive administrative record of more than 26,000 pages and briefs which exceeded the page limits set forth in this court's rules. Plaintiffs' arguments were detailed and multi-faceted. The court has attempted to give each substantive argument its due measure. Plaintiffs' less substantive arguments, which were omitted from this opinion for the

continue...

2

# BACKGROUND

## I.  Procurement Summary

### A.  Medicare Administrative Contractor for Jurisdiction E

"CMS historically . . . used private insurance companies to process claims and perform related administrative services for Medicare beneficiaries and health care providers . . . ."  AR at 128.  More recently, however, these tasks have been performed, on a regional "jurisdictional" basis, by Medicare administrative contractors (MACs).  *Id.* at 128-29.  The region at issue here is "Jurisdiction E," formerly known as Jurisdiction 1 (J1), and is composed of "California, Nevada, Hawaii, and the Pacific Islands of American Samoa, Guam, and Northern Mariana."  *Id.* at 129.  The particular services competed in this procurement are referred to as "claims benefit administration services in support of Medicare Part A and Part B claims for Jurisdiction E."  *Id.*

The tasks to be performed by the MAC chosen through this procurement include "all core claims processing operations," "[m]edical review and local provider education and training," the "Provider Customer Service Program (PCSP)," the "Medicare secondary payer (MSP) program," "[a]ppeals other than initial claims determinations," and "[p]rovider oversight."  AR at 129.  CMS has determined that the appropriate contracting vehicle for this MAC contract is a cost-plus-award-fee (CPAF) contract.  *Id.* at 132-34.  The government estimate for the cost of the contract, including option years, is $506,869,115.  *Id.* at 130.  Palmetto is the incumbent MAC for these services in this region.

### B.  The Solicitation

The agency issued Solicitation No. CMS-2011-0026 (solicitation or RFP) on December 5, 2011.  AR at 135.  Proposals were due by January 25, 2012.  *Id*.  Two amendments to the solicitation were issued.  AR Tabs 24-25.  Only three offers, from CGS, Palmetto and Noridian, were received in response to the solicitation.

---

[2]/  ...continue
sake of brevity, were considered but rejected as unpersuasive.

*Id.* at 13853.  The resulting contract is to include a one-year base period, four option years, and a six-month option for a close-out period.  *Id.* at 1315.

Award would be based on the written proposals submitted by the offerors, as supplemented by oral presentations and by past performance information available to CMS.  AR at 2084-85, 2115-17.  Offerors were given notice that award might be made without discussions, through a reference to FAR 52.215-1, 48 C.F.R. § 52.215-1 (2011).[3]  *Id.* at 2052, 13854.  The anticipated contract award date was June 10, 2012.  *Id.* at 2063.

## C.  Evaluation Criteria

### 1.  Overview

Section M of the solicitation outlines the agency's proposal evaluation scheme.  CMS would choose the "best value" proposal:

> Award will be made to the Offeror(s) whose proposal offers the best overall value to the Government.  This will be determined by a trade-off technique allowing the Government to consider award to other than the lowest cost Offeror or other than the highest technically rated Offeror in accordance with FAR Part 15.101-1.  This process permits tradeoffs between cost and non-cost factors and allows the Government to accept other than the lowest priced proposal.

AR at 2111.

Offerors were on notice that non-cost factors, when combined, were "significantly more important than cost or price."  *Id.*  The agency would consider the reasonableness and the realism of the costs proposed by the offeror; the cost realism analysis would determine whether

---

[3]/  All further references to the Federal Acquisition Regulation (FAR) are to the 2011 edition of Title 48 of the Code of Federal Regulations, the version of the FAR applicable to the procurement actions reviewed here.

estimated proposed cost elements are realistic for the work to be performed, reflect a clear understanding of the requirement and are consistent with the unique methods of performance and materials described in the Offeror's technical proposal.

*Id.* An offeror's *proposed costs*, pursuant to FAR 15.404-1(d)(2), would be corrected to reflect *probable costs* predicted by the agency's cost realism analysis, where needed. AR at 2111; *see also* FAR 15.404-1(d)(2). Probable costs would be the costs used in the agency's "best value" analysis. FAR 15.404-1(d)(2)(i).

## 2. Evaluation Factors and Aspects

The agency formed a Technical Evaluation Panel (TEP) to "evaluate and rate each technical proposal (including the written technical proposal and Oral Presentation, inclusive of the oral presentation slides) by applying the weighted Technical Evaluation Factors set forth" in the solicitation. AR at 2115. The first of the three technical evaluation factors, weighted at 40%, was past performance:

The evaluation of past performance will be based on the Offeror's demonstrated ability, (considering its performance of the requirements of other contracts of a similar nature, scope, and complexity as the MAC contract) to successfully meet the requirements of the [Statement of Work (SOW)] in this solicitation.

*Id.* The second of the three technical evaluation factors, also weighted at 40%, was technical understanding, which was reflected in the offeror's approach to performing the tasks required by the contract. *Id.* The third technical evaluation factor, weighted at 20%, was the offeror's approach to implementation activities required to begin performance of the contract services. *Id.* at 2092, 2115.

The rating for each of the evaluation factors listed above would be the result of the TEP's consideration of identified findings (within each evaluation area), and further consideration of the following four "aspects" of an offeror's proposal: (1) customer service; (2) financial management; (3) operational excellence; and, (4) innovations and technology. AR at 2116. The relationship between technical

evaluation factors and technical evaluation aspects is summarized in the solicitation:

> In performing its review of each evaluation factor (Past Performance, Technical Understanding and Implementation), CMS will consider all of its findings *in relation to* one or more of the . . . four aspects. These aspects are not factors or subfactors. They are elements for CMS' consideration in evaluating the three factors, Past Performance, Technical Understanding and Implementation . . . .

*Id.* (emphasis added). In the court's view, the evaluation *factors* provide a useful tool for dividing an offeror's proposal into three evaluation areas, whereas the evaluation *aspects* offer an additional measure relevant to these evaluation areas which may identify an offeror's positive organizational attributes. *See id.* (stating that each of the four technical evaluation "aspects" *may* be considered by CMS as a measure of a contractor's abilities).

## II.     Evaluation of Proposals

### A.     Overview of Proposal Evaluations by the Technical Evaluation Panel (TEP) and the Business Evaluation Panel (BEP)

The Source Selection Plan (SSP) was approved on December 16, 2011. AR at 2292. This document describes thorough processes for examining proposals and evaluating these proposals according to the criteria identified in the solicitation. There is no real dispute that CMS followed these procedures – for this reason, the court will not discuss the SSP in detail. It is important to distinguish, however, various roles established by the SSP.

The TEP produced the offerors' ratings for past performance, technical understanding and implementation. The process followed by the TEP identified, for each proposal, any strengths, weaknesses, and significant weaknesses related to these evaluation factors, and also produced each offeror's numeric score on each of

the three evaluation factors.[4]  The BEP, on the other hand, had a different function. Rather than produce an evaluation rating, the BEP closely examined the costs of the services proposed by each offeror.  The BEP would determine whether the offeror's proposed cost elements were reasonable and realistic, and whether the technical and cost proposals of an offeror were consistent.

Along with the TEP and the BEP, there were various other players in the evaluation process, such as the Technical Cost Analyst (TCA), and various staff at CMS that served as Subject Matter Experts (SMEs).  The SMEs, in particular, played an advisory role, and their comments might be adopted by the TEP or the BEP, if deemed appropriate.  AR at 2281, 5171.  The results of the deliberations of the TEP were presented in the TEP report, which was signed on September 10, 2012.  *Id.* at 5207.  The results of the deliberations of the BEP were presented in three reports, one for each offeror, signed on September 13, 2012.  *Id.* at 10996, 11280, 11834.

## B.    TEP Ratings for the Offerors' Proposals

### 1.    The Rating Scale

The rating scale adopted by the agency had a primary purpose of considering particular findings of strengths, weaknesses and significant weaknesses and expressing those findings in a numerical rating for each of the three evaluation factors.  AR at 2293 ("The purpose of the Numeric rating methodology is to assess the value of Offeror proposal claims or promises through review of all pertinent findings (strengths, weaknesses, significant weaknesses and deficiencies), as defined below, as they apply to the evaluation factors.").  The ratings would reflect the evaluators' prediction of each offeror's potential for "success" as the MAC for Jurisdiction E, on a scale that ranged from a lowest score of .1 to a highest score of .9:

> **.6 to .9** - More Likely to succeed than fail, with .9 being the highest possible score;
>
> **.5** - Equally likely to succeed or fail;

---

[4]/  None of the proposals were judged to contain deficiencies.  AR at 5177.

7

> **.1 to .4** - More likely to fail than to succeed, with .1 being the lowest possible score.

*Id.* (formatting altered).

The court notes, first, that there is nothing inherently suspect about a scale that measures potential for successful performance in tenths or hundredths of a point. *See* CGS Mot. at 36-37 & n.17 (implying that the agency's rating scale suffered from "'false precision'" because it used tenths and hundredths of a point to distinguish ratings received by the offerors). There is no meaningful difference between such a scale and a 100 to 900 point scale. One weakness of the scale adopted by the agency, however, is that the central band of equipoise between success and failure is not defined as a range but as a simple point (.5), with some ambiguity as to the interpretation of a rating of .41 or .59 (is the former closer to the lower band of the scale, or to .5?; similarly, is the latter closer to the upper band of the scale, or to .5?). Notwithstanding this regrettably murky aspect of the rating scale, the court finds nothing irrational in the evaluation rating scheme.

Once the TEP had produced a rating for each of the evaluation factors for each offeror, the weighted evaluation factor ratings would produce a final technical rating for the offeror's proposal. AR at 2293 ("Each factor will then have its rating or score multiplied by the weight assigned to that factor (Past Performance - 40%; Technical Understanding - 40%; Implementation - 20%), the three factor scores will then be added together to provide a final score for the proposal."). For two of the three evaluation factors, technical understanding and implementation, this summary of the evaluation process adequately explains the process followed to establish the ratings received by the three offerors. For the past performance evaluation factor, however, the rating scheme had some additional steps which are the focus of much debate among the parties.

### 2. The Past Performance Baseline Score and Final Score Evaluation Scheme

The three offerors are well-known to CMS, in that they have been contractors with the agency since 1966. AR at 3157, 4573, 5048. Each of the offerors has current experience as a MAC. *Id.* at 5180, 5195, 5202. There was a wealth of information regarding the offerors' past performance before the agency, and the court will only discuss this information in the most general terms.

The court must reject plaintiffs' challenges to the past performance evaluation *scheme* adopted by the agency,[5] for the simple reason that the court finds nothing irrational in the past performance evaluation methodology adopted by CMS. Plaintiffs suggest that the evaluation scheme could have been improved to produce more accurate ratings. In essence, plaintiffs ask the court to substitute some other reasonable evaluation scheme (or schemes) for the one adopted by the agency. Plaintiffs' burden, however, is to show that the past performance evaluation scheme employed by CMS was arbitrary. *See infra*. The court addresses plaintiffs' primary challenges to the past performance evaluation scheme here, as it describes the methodology employed by the TEP.

First, CMS chose to give greater consideration, and more weight, to the most relevant types of past performance. More recent experience (*i.e.*, the last three years) was also the focus of the agency's past performance evaluation, both of the offeror and of any significant subcontractors. AR at 5172. In the court's view, this approach evidences a focus on general trends in performance, as required by FAR 15.305(a)(2)(i).[6] The agency's scoring scheme deliberately awarded greater weight to two types of performance indicators ("Contractor Performance Assessment Rating System (CPARS) reviews, National Institutes of Health (NIH) evaluations") than to a third type ("Award Fee evaluations"). AR at 5172. Furthermore, for the CPARS reviews, the agency concentrated on just four of six evaluative ratings received in those CPARS reviews. *Id.* at 5176-77. All of these decisions are rational and well within the discretion of the agency in conducting a past performance evaluation of the offerors responding to a solicitation.

---

[5]/ Plaintiffs' challenges to the past performance *ratings* received by the offerors are discussed in the analysis section of this opinion, *infra*.

[6]/ The court has found no authority requiring that a procuring agency develop a past performance evaluation scheme which discerns and assigns a particular, quantified weight to upward or downward trends in an offeror's past performance. The regulation cited by Palmetto, FAR 15.305(a)(2)(i), merely requires that the agency consider "general trends" in the contractor's past performance. That standard has been fully met here. The agency averaged highly relevant past performance ratings received during the most recent three years of contract performance, and then performed a substantive analysis of the entire body of past performance source documents before the agency. These analyses accounted for the general trends in past performance for each of the offerors.

Second, the agency used the three principal past performance indicators (CPARS, NIH and Award Fee) to calculate what it termed a baseline numeric past performance rating. AR at 5175 ("The baseline numeric score provided the TEP a framework to weigh the different adjectival ratings assigned in each formal performance evaluation report for all Offerors . . . ."). The baseline score calculation for each offeror began with the averaging of Award Fee determinations, and a subsequent averaging of the (one) average Award Fee rating with the CPARS and NIH ratings. *Id.* This baseline score was then adjusted, up or down, to reflect the TEP's consideration of other past performance information, as well as information contained in the narrative sections of the CPARS, NIH and Award Fee determinations. *Id.* at 5175-77. Thus, there could be a significant difference between the baseline and final score for the past performance of each offeror. This aspect of the evaluation scheme for past performance is also rational and within the agency's discretion.[7]

Third, CMS utilized a conversion mechanism for the three principal past performance indicators, so that adjectival ratings in the CPARS, NIH and Award Fee determinations could be combined, mathematically, to produce the baseline numeric past performance score for each offeror. Although plaintiffs strive mightily to convince the court that the conversion scheme was illogical in its assignment of certain numerical ratings to certain adjectival ratings, these arguments are not persuasive. The record shows that the conversion scheme, set forth in a chart in the TEP report, AR at 5173-75, was applied uniformly to each offeror's past performance data and that the conversion scheme conveyed meaningful distinctions in the baseline numeric past performance ratings of the offerors. To the extent that plaintiffs argue that the TEP baseline numeric past performance scores do not carry the same meaning as the adjectival ratings in certain source documents, there is no requirement that there be perfect symmetry between one particular past performance indicator and an agency's quantitative

---

[7] It is of no import that individual data points for a particular offeror might have a lesser or greater impact on the calculation of the baseline numeric score, or that a particular offeror's constellation of data points permitted a slightly lower or slightly higher maximum baseline score. The baseline score provided a fair framework for the analysis of each offeror's ratings on the most highly relevant past performance information available to the agency, and the baseline score could be adjusted by the TEP upward or downward to reflect the information contained in all of the past performance source documents before the agency.

(and preliminary) rating of an offeror's past performance.[8]  The court finds that the agency's past performance evaluation scheme, as a whole, was rational and within the agency's discretion.

### 3.    The TEP Ratings for CGS, Palmetto and Noridian

Turning first to the past performance evaluation factor, Palmetto received the lowest scores in this area:  its Award Fee average score was .55; its baseline score was .58, and its final score was .4.  AR at 5190.  CGS fared better in its past performance ratings:  its Award Fee average score was .7; its baseline score was .66, and its final score was .7.  *Id.* at 5205.  Noridian had the best past performance ratings among the offerors:  its Award Fee average score was .7; its baseline score was .82, and its final score was .87.  *Id.* at 5198.

As for the technical understanding evaluation factor, CGS received the lowest score (.6), Palmetto was more highly rated (.7), and Noridian received a perfect score (.9).  AR at 5206.  For the implementation factor, Noridian received the lowest rating (.7), CGS received a higher rating (.8), and Palmetto, the incumbent, received a perfect rating (.9).  *Id.*  Once these ratings were weighted to produce the final technical evaluation score for each offeror, Noridian was well in the lead at .85, followed by CGS at .68, with Palmetto trailing at .62.  *Id.*

The TEP concluded that:

> After reviewing and evaluating the proposals, in accordance with the evaluation factors and aspects as described in the RFP, the TEP determine[d] that Noridian Administrative Services emerged as having proposed a better technical approach to both the general and the Jurisdiction E-specific workload requirements than the other two Offerors.  The Panel also agreed that this same proposal demonstrated more realistic technological

---

[8]/ Palmetto also contends that the agency's past performance evaluation was irrational because Palmetto's CPARS ratings are much better than its final past performance score.  Tr. at 44-45.  The TEP, however, could rationally assign an offeror a lower past performance rating *if* the distinction between the TEP's past performance rating and the CPARS ratings is adequately explained in the record.  Here, the TEP report contains a rational explanation for that distinction. *See* AR at 5184-90, 5250-67.

> innovations that would lead to both improved customer
> service for providers and administrative savings to the
> Medicare program.

AR at 5206.  The court now turns to the evaluation of the offerors' costs by the BEP.

### C.    Overview of Adjustments to Each Offeror's Cost Elements

The BEP reports on the offerors' price proposals reflect, in the court's view, a rational and well-documented evaluation of the costs proposed by the offerors. According to each of these reports, "the business proposal evaluation consist[ed] of a combination of price analysis, cost analysis, and cost realism analysis of the Offeror's cost proposal."  AR at 10957, 11216, 11773.  Plaintiffs do not challenge the type of analysis conducted by the BEP, but instead challenge certain cost realism adjustments to the offerors' proposed cost elements.  These challenges will be addressed in the analysis section of this opinion.

For each offeror, there are three dollar figures which summarize the work of the BEP.  First, there is the figure representing the offeror's proposed costs for the contract, which is derived from the offeror's cost proposal for the base period and all option periods of the contract, including award fees.  For CGS this figure is $344,515,427, for Noridian this figure is $345,206,187, and for Palmetto this figure is $392,324,975.  AR at 10961, 11220, 11777.  The court notes that even without the cost adjustments produced by the BEP, the offerors' price proposals identify CGS as the lowest-cost offeror, closely followed by Noridian, with Palmetto a distinctly more expensive competitor.

The second summary figure for each offeror is the total cost realism adjustment to the offeror's cost proposal produced by the BEP, which summarizes a number of individual adjustments to particular cost elements.  This figure reflects, in the view of the BEP, the total amount needed to adjust, upward, an offeror's proposed costs to more accurately estimate that offeror's probable costs over the life of the contract.  For CGS this adjustment figure is $26,716,738, for Noridian this figure is $27,839,554, and for Palmetto this figure is $15,856,240.  AR at 10961, 11220, 11777.

12

The third summary figure for each offeror is the total of its proposed costs (the first figure discussed *supra*) and the BEP's total cost adjustment amount (the second figure discussed *supra*); this total figure represents each offeror's probable costs over the life of the contract. For CGS this total probable costs figure is $371,232,165, for Noridian this figure is $373,045,741, and for Palmetto this figure is $408,181,215. AR at 10961, 11220, 11777. The court notes that *after* the cost adjustments produced by the BEP, the offerors are still in the same position as regards the price competitiveness of their proposals: the offerors' probable costs identify CGS as the lowest-cost offeror, closely followed by Noridian, with Palmetto a distinctly more expensive competitor.

The court observes that it is these adjusted, probable costs for each offeror that were used in the best value award decision of the contracting officer. AR at 13880, 13884-85. This approach is consistent with both the RFP and the FAR. *See* AR at 2111; *see also* FAR 15.404-1(d)(2)(i). The court notes, further, that the price premium paid by the agency to choose Noridian over CGS is, in relative terms, extremely small. The difference in probable costs between Noridian and CGS is only 00.49% – less than one-half of one percent. The court turns next to the source selection decision memorandum, which presents the contracting officer's rationale for her best value award of the contract to Noridian.

## III. Best Value Award Decision

### A. Overview

The contracting officer served as the source selection authority (SSA) for this procurement. AR at 2272. The record of her award decision is presented, in large part, in a sixty-page document titled "Source Selection Authority Decision Memorandum," dated September 20, 2012. AR Tab 62. This source selection memorandum (SSM) is extremely thorough and well-reasoned; indeed, the detailed analysis contained in this document is more coherent and comprehensive than the analyses that this court typically encounters in source selection documents.[9]

---

[9] Bid protests of MAC contract awards appear to be common. *See, e.g.*, *Noridian Admin. Servs., LLC*, B-401068.13, 2013 CPD ¶ 52, 2013 WL 427848, at *1-*2 (Comp. Gen. Jan. 16, 2013) (describing several protests that followed the award of a MAC contract).

The SSM also incorporates the TEP report and the BEP reports, and the SSA largely adopts the findings and recommendations in these reports. AR at 13858-59, 13880. The parties briskly debate the question of whether the SSA relied upon various numeric scores used by the TEP as a framework for comparing proposals. The court concludes that the SSA relied upon numeric scores, and upon other findings by the TEP, to a great extent, with three caveats. First, the SSA clearly acknowledged that the evaluation of proposals by the TEP was more qualitative than quantitative. *Id.* at 13856. As a result, the assignment of strengths and weaknesses to proposals did not mechanically correlate to a particular rating on the rating scale for the evaluation factors, either in the case of the TEP report or in the case of the SSM. *Id.*

The second caveat concerns the adjustment of baseline numeric scores for past performance to final evaluation ratings for past performance. The SSM clearly describes the baseline numeric scores as providing a baseline score, not a final score. AR at 13858. Thus, the SSA's reliance on baseline scores is a nuanced one, because adjustment of the baseline scores was contemplated before a final rating could be established for each offeror on the past performance evaluation factor.[10] The SSA relied on baseline numeric scores for past performance, but only as these scores provided a framework for further evaluative scoring of past performance.

The final, and perhaps most important caveat, is that the SSA exercised her independent judgment and did not expressly adopt every finding, rating and recommendation of the BEP and the TEP.[11] AR at 13853, 13859, 13880. In particular, the SSA took into account information that was not available during initial TEP deliberations and discussed the impact of such information on her award decision. *See, e.g.*, AR at 13904-05. Thus, although the SSA relied to a great extent on the findings and ratings produced by the TEP, the SSA's reliance was not absolute; rather, the SSA's award decision was informed not only by her

---

[10]/ To the extent that the SSA's brief recitation of the information considered by the TEP as it adjusted baseline numeric scores for past performance differs from the more complete description of this process in the TEP report, the court, following guidance provided in the SSM, relies on the TEP report. *See* AR at 13858 ("A complete description of the Past Performance evaluation, and the methodology used, is contained within Section II of the TEP Report.").

[11]/ The parties have not noted any instances where the SSA and the BEP disagreed as to a particular cost realism analysis finding.

14

independent judgment but also by information that was not discussed in the TEP report.

## B.     Trade-off and Best Value Award Rationale

The SSA adopted the evaluation ratings produced by the TEP and concluded that Noridian offered the proposal with the highest technical ranking.  AR at 13890.  She also adopted the BEP's adjustments to the offerors' proposed costs. *Id.*  When the offerors' probable costs were considered, CGS was the lowest-cost offeror, with Noridian a close second as to price.  *Id.*  A best value trade-off analysis, analyzing the relative advantages of the proposals submitted by CGS and Noridian, was then conducted by the SSA.  *Id.*  Although Palmetto's higher costs rendered a trade-off analysis of Noridian's and Palmetto's proposals unnecessary, the SSA nonetheless included a full comparative analysis of all three proposals.  *Id.* at 13891.

The SSA noted that in this procurement "all evaluation factors other than cost or price, when combined are significantly more important than cost or price." AR at 13891.  She further noted that Noridian's "proposal represents the best overall value to the government as demonstrated by [its] superior technical rating." *Id.*  The SSA concluded that the strengths of Noridian's proposal outweighed the cost advantage of the proposal submitted by CGS.  *Id.*

The SSM contains a lengthy and detailed analysis of the proposals submitted by CGS, Noridian and Palmetto, and discusses each proposal in light of the evaluation factors and aspects set forth in the RFP.  At the conclusion of this analysis, the SSA stated that:

> The [Noridian] and CGS proposed costs were competitive, with [Noridian's] proposed costs being $690,760 higher than CGS proposed cost; and after cost realism adjustments, the [Noridian] costs were $1,813,576 higher than the CGS costs.  However based on the [Noridian] consistent historical innovations and its ability to experience contract cost lower than the negotiated cost, I am confident that [Noridian] will bring the same superior performance and commitment to technological advancements and consequent cost savings

15

to the [Jurisdiction E] contract as it has done with its JD and J3 contracts. The anticipated cost savings notwithstanding, technical ability is rated as the most important factor, and the SSA is willing to pay a small cost premium for a clearly superior technical approach.

AR at 13911. The SSA also noted that the TEP and the BEP "evaluations were comprehensive, objective and fair." *Id.* Because Noridian's "proposal represent[ed] the best overall value for CMS . . . [and was] determined to have no significant weakness or technical or cost issues requiring discussion," the SSA awarded the contract to Noridian without discussions. *Id.* at 13890, 13910, 13912.

The SSA also, in the alternative, conducted a trade-off analysis using different assumptions as to the costs of the offerors' proposals. For this trade-off analysis, she compared "the costs proposed by CGS and Palmetto prior to the cost realism analysis – as compared to [Noridian]'s adjusted costs." AR at 13911. Through this analysis the SSA made an alternative finding, *i.e.*, that a greater cost premium was justified to obtain the advantages of Noridian's proposal. *See id.* ("I can state with certainty that I would nonetheless recommend an award to [Noridian] based on . . . past performance and technical approach discriminators" that outweigh a greater cost premium between CGS's proposed costs and Noridian's adjusted costs). Thus, the SSA was willing to pay a price premium of $28,530,314, or 8.3%, to obtain a "clearly superior technical approach" from Noridian for the MAC contract for Jurisdiction E. *Id.* at 13890, 13911.

## IV. GAO Protest

Both Palmetto and CGS filed timely protests of the contract award with the Government Accountability Office (GAO). The consolidated protests were described as "[p]rotests challenging the agency's evaluation of proposals under the solicitation's past performance, implementation, and technical understanding factors [and] challenging the agency's evaluation of the protesters' and awardee's proposed costs for realism, and upward adjustment of those costs." GAO Opin. at 1. These protests were denied on the merits by GAO on January 18, 2013. *Id.* On February 1, 2013, CGS and Palmetto filed bid protests in this court, bringing similar challenges to the award of the MAC contract for Jurisdiction E to Noridian.

## DISCUSSION

16

# I.  Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2006).  The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded."  *Id.*  As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit.  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citation omitted).

# II.  Standards of Review

## A.  Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record.  To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  The court must make fact findings where necessary.  *Id.*  The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record.  *Id.*

## B.  Bid Protest Review

First, the plaintiff in a bid protest must show that it has standing to bring the suit.  *ITAC*, 316 F.3d at 1319.  This may be accomplished by demonstrating that the plaintiff was an actual bidder and that it was prejudiced by the award to the successful offeror.  *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*AFGE*)).  Prejudice is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error.  *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); *see also* 28 U.S.C. § 1491(b)(4) (describing this court's standard of review for bid protests). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

The higher the degree of discretion allotted the contracting officer, the more difficult it is for a protestor to prove that the procurement decision was arbitrary and capricious. *Burroughs Corp. v. United States*, 617 F.2d 590, 597 (Ct. Cl. 1980) (citation omitted). Negotiated procurements give a "breadth of discretion" to the contracting officer, and impose a heavier burden of proof on a protestor. *Id.* at 598 (citation omitted). Similarly, "best value" contract awards give a contracting officer more discretion than awards based on price alone. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). Thus, the protestor's burden is especially heavy in negotiated, best value procurements. *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 380 (2003) (citations omitted), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation. "[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449 (citations omitted); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss*, 77 F.3d at 449)). "[W]here an agency's

18

decisions are highly technical in nature, . . . judicial restraint is appropriate and proper." *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (citing *Isometrics v. United States*, 5 Cl. Ct. 420, 423 (1984)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. The protestor again bears the burden of proof, and must "show that there was a 'substantial chance' [the plaintiff] would have received the contract award but for the [government's] errors in the bid process." *Id.* at 1358 (citations omitted). If a protestor can show that, but for the procurement error of the agency, there was a substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## III.   Standing

Neither the government nor Noridian contests plaintiffs' standing to bring these consolidated bid protests. But for the procurement errors alleged by plaintiffs, CGS and Palmetto each had a substantial chance of winning the MAC contract for Jurisdiction E. Plaintiffs therefore have standing to bring this protest. *ITAC*, 316 F.3d at 1319.

## IV.   Analysis

The court first addresses two threshold issues of a general nature. The court then proceeds to examine the three major areas of contention in this case: the past performance evaluation, the technical understanding evaluation, and the cost adjustments produced as a result of the agency's cost realism analysis. None of plaintiffs' challenges invalidate the agency's best value award decision.

### A.	Scope of Review Limited to the Contemporaneous Record Before the Agency

The court first addresses the scope of its review.  CGS has emphasized that CMS's award decision must stand or fall based on the reasoning presented in the contemporaneous documentation produced by the TEP, the BEP, and the contracting officer.  *See, e.g.*, CGS Mot. at 11, 13-14.  The court agrees that the best evidence of rational decision-making in this procurement must be found in the contemporaneous documents produced by the agency.  *See, e.g.*, *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *see also Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009) (citing *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  In this case, the court has determined that it need not consider the documents produced by the parties during the GAO litigation.[12]  The contemporaneous documents produced by CMS as it made its award decision provide an adequate factual background to resolve all of plaintiffs' challenges in this bid protest.  The court now turns to plaintiffs' argument that the evaluation of their proposals did not contain adequate detail.

### B.	The Agency's Decision to Generally Limit its Evaluative Commentary to Distinctive Strengths, Weaknesses, and Significant Weaknesses, and to Omit Mention of Features Proposed by the Offerors Which Simply Met RFP Requirements, Was Rational

The TEP explicitly noted in the TEP report that certain features of an offeror's proposal would not be mentioned in the report if those features simply met the requirements stated in the RFP:

> As instructed by the Contracting Officer, and in accordance with the Source Selection Plan, each TEP member documented strengths, weaknesses, significant weaknesses, deficiencies, and other notes identified

---

[12]/  Thus, the following portions of the administrative record will not be cited in this opinion:  AR Tabs 1-8, 66-88.

during their independent review of the full written proposals as well as during oral presentations in relation to the three factors noted above. If a particular feature of a proposal is not included in the TEP report or in the findings files, it means the TEP considered that feature "met" by the Offeror. That is to say, the feature did not warrant a strength or a weakness and was viewed by the TEP to have met the Government's expectations.

AR at 5170. This approach was consistent with the Source Selection Plan. *See id.* at 2275, 2277, 2282-83. In particular, the SSP required the TEP report to "clearly and *concisely* describe[] proposal evaluation consensus results, including the strengths, weaknesses, significant weaknesses, deficiencies associated with each proposal based upon the evaluation factors for award." *Id.* at 2275 (emphasis added). The court finds that the decision to omit a discussion of every feature of an offeror's proposal which simply met contract requirements was rational. Indeed, given the level of detail provided by each offeror, no other approach, in the court's view, would have been practical.

CGS seizes upon the fact that certain features of its technical proposal did not receive comment by the TEP, and suggests that these omissions indicate arbitrary decision-making, disparate treatment of offerors, inadequate documentation of the evaluation process, and other violations of procurement principles. *See, e.g.*, CGS Mot. at 32, 33 n.13, 34, 36 n.16; CGS Reply at 19, 22-24. The court cannot agree. The TEP report could not have commented on every feature of the offerors' proposals and still have provided a concise, useful evaluation summary to assist the SSA in her award decision. As to the caselaw cited by CGS, the court finds nothing in these authorities which indicates that a procuring agency must comment on every feature of an offeror's proposal. The court finds that the TEP report, the narrative portion of which runs approximately forty pages, adequately documents the evaluation of the offerors' proposals.

## C.    Past Performance

As stated earlier in this opinion, the court finds that the past performance evaluation scheme employed by CMS was rational, because it relied on meaningful distinctions in the offerors' most relevant past performance to determine, first, a baseline numeric rating for past performance, which was then adjusted after a

thorough and comprehensive review of all of the past performance data available to the agency.[13] The court turns to plaintiffs' other substantive arguments regarding the past performance evaluation of the offerors' proposals.

Both CGS and Palmetto argue, at considerable length, that the baseline scores and the final scores for past performance assigned to their proposals were flawed. Plaintiffs also contend that Noridian's past performance ratings were too high. None of these arguments have merit. The court begins with the arguments presented by CGS as to its past performance ratings.

## 1. CGS's Past Performance Ratings Were Not Irrational

Aside from CGS's numerous but unpersuasive contentions that the agency's past performance evaluation scheme was fundamentally flawed, *see supra*, CGS also complains that its past performance ratings by the TEP and SSA were subjective, arbitrary and reflected unequal treatment. *See* CGS Mot. at 42-43; CGS Reply at 32-33. The court notes first that there is often some element of subjectivity in proposal evaluations, and that this phenomenon is not necessarily objectionable. *See, e.g.*, *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 274 (2012) ("[T]hese subjective and diverse evaluation determinations of risk to the government are well within the substantial discretion of the Agency and not for the court to second-guess."). Here, the record clearly shows that CMS principally relied upon objective evaluation criteria to determine each offeror's past performance rating, and did not overly engage in subjective adjustments to the baseline numeric scores of the offerors.

As to CGS's other allegations of error, the primary objection is that "satisfactory," "good," "very good," and "excellent" adjectival ratings in CGS's NIH/CPARS reviews only translated to "lackluster" .65 past performance ratings when converted to numeric scores by the TEP. CGS Reply at 31-32 (citing AR at 5205). At oral argument, CGS pointed to its "lackluster" past performance rating and suggested that the agency's past performance rating scheme turned CGS's good performance reviews into bad reviews. Tr. at 37. As stated *supra*, however, the court finds that the agency's evaluation scheme was rationally and uniformly

---

[13]/ The court divided plaintiffs' arguments concerning the agency's past performance evaluation into two types: (1) arguments attacking the past performance evaluation *scheme* are discussed in the background section of this opinion; (2) arguments attacking particular past performance evaluation *findings* and *ratings* are discussed here.

applied to a significant amount of relevant past performance information.  None of CGS's arguments persuade the court that CGS's baseline past performance score of .66 and its final past performance rating of .7 were irrational, arbitrary, or the product of unequal treatment of the offerors' proposals.

### 2. Palmetto's Past Performance Ratings Were Not Irrational

Like CGS, Palmetto offered numerous but unpersuasive arguments that the agency's past performance evaluation scheme was fundamentally flawed.  *See supra*.  In addition, Palmetto alleges that several errors marred the scoring of its past performance, most of which relate, primarily, to the downward adjustment of Palmetto's baseline score (.58) to arrive at .4 for Palmetto's final past performance score.  The court will briefly address each of these arguments.

### a. Transition Period Difficulties

Palmetto argues that it received lower performance evaluations during a unique and difficult "transition period" and that these low ratings, at the very least, should have been heavily discounted by CMS.  Palmetto Mot. at 20-21.  The agency responds that there was nothing unfair in the weight accorded the low performance ratings which reflected performance problems which lingered well after an initial transition period.  Def.'s Mot. at 27-29.  The court must agree with defendant.  To the extent that these low ratings contributed to Palmetto's baseline past performance score and the adjustment to that score, the court finds nothing irrational in the agency's consideration of the "transition period" ratings received by Palmetto.

### b. Precipitous Drop from .58 to .4

It is clear that Palmetto's baseline past performance score received a greater adjustment than the baseline scores of CGS and Noridian (negative .18 compared to positive .04 or positive .05).  The court, however finds nothing irrational in the magnitude of the adjustment.[14]  Palmetto argues that there is no "coherent

---

[14]/  A score of .58 can reasonably be interpreted to be within the "Equally likely to succeed or fail" range (described as .5 on the scale adopted by the agency), rather than in the "More likely to succeed than fail range" (described as .6 to .9).  AR at 2293.  Thus, Palmetto's

continue...

23

explanation" for the adjustment. Palmetto Mot. at 22. The TEP report, however, contains a lengthy analysis of Palmetto's past performance, based on information gleaned from numerous sources. AR at 5184-90. As to the adjustment, in particular, the TEP gave a coherent explanation, in the court's view. First, a general description of the adjustment was given:

> The TEP . . . focused on whether the strengths and weaknesses outlined in the sections above should increase or decrease the overall rating and to what degree. Based on the significant weaknesses highlighted above, the TEP concluded that the impact of poor performance in these areas is so severe and the risk to the Medicare program is so high, that these failures warrant a significant reduction in the rating.

*Id.* at 5189. Second, the TEP noted two particular failings that warranted a reduction in Palmetto's baseline past performance score. *Id.* Under the deferential standard of review applicable here, the downward adjustment of Palmetto's baseline past performance score was not irrational.

### c.    Most Recent Option Year Information

Palmetto argues that there are problems with the agency's consideration of its CPARS evaluation for Option Year 3 of its Jurisdiction 1 MAC contract. Palmetto Mot. at 16-17. Defendant concedes that this past performance information was not considered by the TEP in calculating a baseline score for Palmetto, but notes that this information only became available after the TEP had completed its analysis of past performance. Def.'s Mot. at 20. The court finds no fault with the agency's consideration of Option Year 3 only in the adjustment of Palmetto's baseline score, rather than in the baseline score itself.

Furthermore, according to Noridian, the Option Year 3 ratings would have only increased Palmetto's baseline score by .01, raising the baseline score from .58 to .59. Noridian Mot. at 33. The record supports Noridian's contention. *See* AR

---

[14]/  ...continue
fall from .58 to .4 could reasonably be described as slipping from "Equally likely to succeed or fail" to "More likely to fail than to succeed" (.1 to .4). *Id.*

at 5190; Palmetto Mot. at 16. Even if the omission of the Option Year 3 information in Palmetto's baseline score could be considered to be an evaluation error on the part of CMS, the *de minimis* alleged error in Palmetto's baseline score, which only provided a framework for the development of a final past performance score, did not prejudice Palmetto.

Palmetto also does not find the SSA's explanation of her consideration of the Option Year 3 information to be reasonable, adequately documented or supportable. Palmetto Mot. at 16-17. The court disagrees. After a lengthy discussion of Palmetto's improved performance during Option Year 3, she concluded that:

> The above recent information demonstrates that Palmetto's performance has improved and is definitely a benefit to the agency and the provider community. The SSA considers this a strength with long term cost saving implications and shows that Palmetto is making strides to correct deficits in its past performance. However, it is the opinion of the SSA that this performance does not reach the level of consistent, reliable excellence demonstrated by the [Noridian] past performance and does not warrant, at this time, a change in Palmetto's past performance rating. In fact, it was the opinion of the SSA, prior to its review of the J1 OPY 3 CPARs review that the Palmetto past performance was such that its numeric rating actually warranted being lowered because of those SSA concerns related to the significant weaknesses assigned by the TEP . . . .

AR at 13905. The SSA then proceeded to detail exactly which past performance deficits justified keeping Palmetto's past performance final score at .4. *Id.* at 13905-06. The court finds nothing unreasonable, inadequate or unsupportable in the SSA's explanation of her consideration of the Option Year 3 past performance information for Palmetto.[15]

---

[15]/ Palmetto casts aspersions on the explanation provided by the SSA, describing her final, unchanged past performance rating of Palmetto as an "improbable coincidence," Palmetto

continue...

### d. Allegations of Impermissible Double-Counting of Palmetto's Past Performance Data

Palmetto argues that one of the flaws in its past performance rating was the "double-counting" of certain performance periods (those which included Award Fee reviews) as opposed to the "single-counting" of another performance period (which was not eligible for Award Fees). Palmetto Mot. at 18-19; Palmetto Reply at 10-11. This argument is not persuasive. The agency included an *average* Award Fee score, and *each* NIH and CPARS score then available, to calculate a baseline past performance score. CMS coherently explained why such a calculation provided a framework for the further consideration of all past performance information available for Palmetto and the other offerors. AR at 5172-77. Both the baseline score methodology and the adjustment methodology were reasonable. To the extent that Palmetto argues that its best performance period was undervalued by CMS in the final past performance rating assigned Palmetto, the record does not reveal that the agency's consideration of that performance period was irrational.

At oral argument, Palmetto also complained that one of the primary past performance source documents, CPARS, contains subsidiary measures that the agency double-counted. Tr. at 45. It is certainly possible that information contained in the CPARS evaluations contributed to both an offeror's baseline score and the adjustment to that score. In the court's view, however, that does not equate to impermissible double-counting.[16] The baseline score was a framework to guide further weighing of all of the past performance information relevant to that offeror. Negative information might be *considered* twice, *i.e.*, applied for more than one purpose, but only to arrive at a single, final, and comprehensive rating for each

---

[15]/ ...continue

Mot. at 17, and "plainly unsupported and unsupportable," Palmetto Reply at 9. The court notes that "there is a presumption . . . that government [procurement] officials act in good faith." *Galen Medical*, 369 F.3d at 1335 (citing *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002)) (emphasis removed). That presumption has not been rebutted here.

[16]/ The TEP showed an awareness of double-counting that might skew a past performance evaluation, and eliminated at least one form of double-counting. *See* AR at 5176 ("Because the NIH/CPARS and Award Fees reports had already been incorporated into the baseline score, the TEP did not assign new findings (e.g. strengths or weaknesses) based on the narrative in those reports.").

offeror's past performance. The court notes that considering certain pieces of information relevant to an offeror's proposal for multiple purposes during evaluation proceedings is not impermissible. *E.g.*, *EBA Eng'g, Inc.*, B-275818, 97-1 CPD ¶ 127, 1997 WL 150996, at *9 (Comp. Gen. Mar. 31, 1997). The court finds nothing irrational or impermissible in the past performance rating of Palmetto's proposal.

### 3.     Noridian's Past Performance Ratings Were Not Irrational

CGS complains that Noridian received a near-perfect past performance score that was not justified in light of the information contained in the past performance source documents before the agency. As a threshold matter, there are factual flaws in plaintiff's argument. Furthermore, the court cannot agree with CGS's proposition that the final past performance score for Noridian was irrational.

First, CGS contends that Noridian received .87 out of a possible .875 for past performance – a near-perfect score. CGS Mot. at 43; CGS Reply at 34. The maximum score for past performance was .9, not .875. AR at 5171-72. It might be said that Noridian received a near-perfect score for past performance, but CGS has mischaracterized the distance between .87 and a perfect score.

Second, CGS suggests that the .05 upward adjustment of Noridian's baseline past performance score (.82) must have been entirely based on past performance other than that reviewed in the NIH, CPARS and Award Fee evaluations. The record does not support this assertion. The TEP considered *all* past performance information in making its adjustments to the baseline past performance scores, *see* AR at 5176, and CGS mistakenly excludes the NIH, CPARS and Award Fee evaluations as source documents considered for the adjustments made to the baseline past performance scores.[17]

Based on this misreading of the record, CGS argues that certain source documents do not support a "near-perfect" rating for Noridian's past performance.

_____

[17]/ CGS relies heavily on a statement in the SSM which, when summarizing the TEP's past performance evaluation methodology, neglects to mention every source document considered by the TEP in its adjustments to baseline scores. *See* AR at 13858. The next sentence in the SSM, however, directs the reader to "[a] complete description of the Past Performance evaluation, and the methodology used, . . . contained within Section II of the TEP Report"). *Id.*; *see also supra* note 10.

CGS Mot. at 44-45; CGS Reply at 35-36. The court has reviewed the TEP's explanation for Noridian's baseline score of .82 and for the .05 adjustment to that baseline score and finds nothing irrational in those scores, despite the less-than-perfect ratings received by Noridian on some measures highlighted by CGS. *See* AR at 5195-98. The court agrees with Noridian, Noridian Mot. at 32, that under the deferential review this court accords past performance evaluations in negotiated procurements, Noridian's past performance scores were not erroneous. *See, e.g.*, *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003) (noting that past performance evaluations in this type of procurement are accorded a "triple whammy of deference").

For all of the above reasons, the agency's past performance evaluation of the offerors' proposals has not been shown to be arbitrary, capricious or contrary to law.

## D. Technical Understanding

Plaintiffs challenge numerous aspects of the agency's technical understanding ratings for the offerors. Noridian received a perfect score (.9) for this evaluation factor, so it is not surprising that plaintiffs attack the strengths assigned to Noridian's technical proposal in an effort to invalidate that score. Plaintiffs also attack certain weaknesses assigned to their proposals, and further argue that certain of their proposed approaches, which were *not* rated as strengths, were comparable to Noridian's proposed features which *were* rated to be strengths; thus, plaintiffs argue that their proposals received unequal treatment. The court's discussion of plaintiffs' arguments will be limited to plaintiffs' principal contentions.[18]

### 1. RapidApp

The MAC for Jurisdiction E will enroll physicians and other medical providers into the Medicare program. *See* AR at 369-71. For this task of provider

---

[18]/ The court has considered all of plaintiffs' arguments. Arguments not specifically addressed in this opinion section were not at all persuasive. In many instances, the court was asked to substitute its judgment for that of the agency's as to the merits of highly technical features of the offerors' proposals. The court defers, however, to the agency's expertise, as it must. *E.W. Bliss*, 77 F.3d at 449 (stating that the court should not second-guess "technical ratings and [other] discretionary determinations of procurement officials") (citation omitted).

enrollment, Noridian proposed to automate the process using a system called RapidApp. *Id.* at 2502-03. The agency relied upon its evaluation of RapidApp both for the technical understanding evaluation factor and its cost realism analysis of proposals. In this opinion section, the court focuses only on the agency's appraisal of the value of RapidApp as support for Noridian's .9 technical understanding rating.[19]

In broad strokes, the evaluation of RapidApp occurred in three phases. First, the TEP awarded Noridian a strength for RapidApp, and noted this strength in the TEP report. AR at 5193 ("The TEP also assigned a strength to the Offeror's proposed innovation, RapidApp."). Second, in a series of emails, members of the TEP were alerted in August 2012 that RapidApp, which was being tested through a pilot program, might not provide as much functionality as their earlier evaluation had estimated, because of changes in the agency's provider enrollment system (Provider Enrollment, Chain Ownership System (PECOS)). *E.g.*, *id.* at 13828-29. The TEP report was not revised to delete the strength for RapidApp, however. Third, the SSA considered the changes to PECOS and the reduced probable functionality of RapidApp. She concluded that RapidApp continued to be a strength for the technical understanding evaluation factor. *Id.* at 13894-95.

The issue before the court is whether the continued appreciation for RapidApp by the SSA, *i.e.*, that RapidApp was an innovation constituting a strength in Noridian's technical proposal despite its reduced probable functionality, was rational. The key passage in the SSM which illuminates this issue is reproduced here:

> RapidApp is a very progressive innovation with the potential to achieve all that the TEP has indicated. It automates [the] provider enrollment process by eliminating many manual processes; and demonstrates a strong understanding of what is required to improve the provider enrollment process. However this application has not been in place for a sufficient period of time to demonstrate that it will achieve everything that is proposed. In addition, subsequent to the completion of the TEP Report, it was learned that CMS may disallow

---

[19]/ The court must, regrettably, split its discussion of RapidApp into two parts.

29

the front-end on-line "interview" feature of RapidApp, since CMS [in PECOS] now has on-line data entry screens available for provider applications. However, the "back-end" automation features of RapidApp may be retained and may serve to foster efficiencies in the administration of the Medicare . . . program. In the opinion of the SSA, despite this new information, RapidApp remains a strength within [Noridian's] proposal. That notwithstanding, it is my conclusion that this new information does not change the overall conclusions reached by the TEP in relation to [Noridian's] technical proposal because the use of this technology for the above "back-end["] processes with its attendant efficiencies is of value to the agency. RapidApp is an innovation indicative of [Noridian] striving to make use of technological advances to promote efficiencies in the Medicare . . . program[.]

AR at 13894-95. As the court understands the SSA's references to RapidApp's front-end and back-end features, the front-end features assist in the automation of the provider's submission of an application for entry into the Medicare program, whereas the back-end features assist in the verification of data contained in the application. *See id.* at 2502, 13894-95, 15920.

Plaintiffs argue that RapidApp, at the time the SSA made her award decision, no longer qualified as an innovation worthy of a strength. CGS, for example, states that RapidApp does not meet the definition of an innovation that merits a strength. CGS Mot. at 24. In support of this contention, CGS relies heavily on the email correspondence between TEP members regarding the possible cancellation of the pilot program for RapidApp. *Id.* at 24-25. Plaintiffs also rely on an email from Noridian to CMS which noted certain incompatibilities between RapidApp and CMS systems. *See* AR at 13829. CGS argues that in the face of uncertainties over RapidApp's functionality, the SSA impermissibly rewrote Noridian's proposal to offer only the back-end features of RapidApp, and chose to irrationally ignore the definition of an innovation provided in the RFP to award a strength to Noridian for RapidApp. CGS Mot. at 25 n.8, 26-27.

30

The definition of an innovation that merits a strength is provided in the SSP, not the RFP.[20] The relevant passage states:

> Strengths may relate to demonstrated or proposed process improvements and innovations that either exist in the Offeror's current operations or that the Offeror newly proposed for the contract. When strength is asserted for proposed innovations and/or process improvements, the Offeror <u>must</u> document that its proposed innovation or process improvement is realistic and the expected outcome is *highly likely to occur. Simply meeting the Statement of Work requirements is not considered a strength.*

AR at 2294. Using this definition, the SSA properly concluded that the back-end automation of provider enrollment offered by Noridian in its RapidApp innovation was a strength. She did not re-write Noridian's proposal to do so.[21] Although plaintiffs may disagree with the SSA's conclusion, the court does not find that the record before the agency shows that the strength awarded to RapidApp was arbitrary or capricious.

## 2. Integrated MSNs

Noridian proposed to integrate certain mailings to a beneficiary (Medicare Summary Notices (MSNs)) into one envelope, thus realizing certain efficiencies in workload processing, AR at 5245 ("The Offeror has integrated Pt. A, Pt. B, and [Durable Medical Equipment] Medicare Summary Notices for the same beneficiary into one mailing envelope."), and was awarded a strength for this "innovation," *id.*

---

[20]/ The section of the RFP cited by CGS merely gives instruction to the offerors as to the definition of innovations, so that these features may properly be identified as innovations in the offerors' proposals. *See* AR at 2088. There is nothing in this section of the RFP which sets forth the definition of an innovation that would be evaluated by CMS as a strength.

[21]/ As Noridian argues, the SSA could rationally read Noridian's description of RapidApp as providing separate back-end and front-end features of independent value to the agency. *See* Noridian's Mot. at 20.

at 5245, 5193-94.[22]  However, as the agency has conceded, integrating MSNs into one envelope was practiced by other MACs and the strength award to Noridian for this aspect of its proposal was erroneous.  Def.'s Mot. at 45-46.

CGS asserted at oral argument that this error in Noridian's technical understanding evaluation was prejudicial to CGS.  Tr. at 30-31; *see also id.* at 8 (asserting that "any error is this procurement is material" and that "if any error is demonstrated [CGS] will have an opportunity to prevail in this competition").  The court must disagree.  The TEP did not cite integrated MSNs as one of the significant strengths of Noridian's proposal when summarizing their deliberations as to the technical understanding evaluation factor.  AR at 5195.  Similarly, the SSA did not specifically mention integrated MSNs when she listed the more notable strengths identified in Noridian's proposal.  *See id.* at 13893, 13895, 13897, 13909-11.  Indeed, integrated MSNs were described as being of "somewhat less value than [Noridian's] more notable strengths."  *Id.* at 13893.  In that regard, the inquiry into prejudice begins with this recognition on the part of the SSA that Noridian's integrated MSNs "innovation" was less valuable than other strengths.

Although CGS insists that this "competition was close," CGS Mot. at 1, the gulf between CGS and Noridian was considerable, in both the past performance and technical understanding factors, the two most heavily weighted non-cost factors.  In past performance, CGS received a score of .7, whereas Noridian received a score of .87, and in technical understanding, CGS received a score of .6, whereas Noridian received a score of .9.  The gulf was similarly great between CGS's overall technical rating, .68, and Noridian's final overall technical rating, .85.  This gulf could not have been bridged, in the court's view, by the elimination of one of the lesser-valued strengths awarded in error to Noridian's proposal.

As to the impact of the elimination of a strength for Noridian's integrated MSNs on the SSA's trade-off analysis and best value award decision, the record is

---

[22]/  Noridian argues that the strength awarded to Noridian was for integrated MSNs *and* other workload processing improvements; therefore, Noridian argues, the integrated MSNs feature of Noridian's proposal was merely "one element of this strength."  Noridian Mot. at 37. It is not clear from the record that CMS made such a distinction.  In any case, whether the integrated MSNs were considered an independent strength or an element of a workload processing improvements strength matters little to the court's analysis here.

clear that such a correction would not have changed the calculus in CGS's favor.[23] The narrative of the SSM shows a strong preference for the technical superiority of Noridian's proposal, and expresses that preference in emphatic terms. Much of the preference expressed by the SSA depends on the value to CMS of the "more notable" strengths in Noridian's proposal. The strength related to integrated MSNs is not of sufficient weight to tip the balance in favor of CGS if that strength were eliminated.

Finally, the court notes that the SSA provided an alternative trade-off analysis, discussed *supra*, where she indicated that she would pay a large price premium for the advantages of Noridian's proposal. In light of such a statement in the SSM, it is not rational, in the court's view, to conclude that the evaluation of proposals was "close," or that the strength awarded in error to Noridian for integrated MSNs was prejudicial to plaintiffs. Noridian's proposal stood head and shoulders above the others, and the deletion of one less notable strength would not have changed the agency's award decision. For all of the above reasons, the error in the rating of Noridian's integrated MSNs was not prejudicial to plaintiffs, and this error does not justify the court's intervention in this procurement. *See, e.g.*, *Bannum*, 404 F.3d at 1357 (stating that "the prejudice determination assesses whether an adjudged violation of law warrants setting aside a contract award").

### 3.    Audit and Reimbursement Weakness

Both plaintiffs proposed the same subcontractor, First Coast Service Options, Inc. (FCSO), for certain Audit and Reimbursement functions. FCSO's Audit and Reimbursement plan was deemed to constitute a technical understanding weakness in the proposals submitted by CGS and Palmetto. Plaintiffs argue that this weakness was undeserved, for a variety of reasons. The evaluation of FCSO's Audit and Reimbursement plan is alleged to have been irrational, unequal, unreasonable, inexplicable, conclusory, unsupported, and opaque. CGS Mot. at 35-36; Palmetto Mot. at 35-40. The three most substantial arguments in this regard are that: (1) the Subject Matter Expert (SME) wrongly criticized FCSO's assumptions in the Audit and Reimbursement plan; (2) the weakness in the technical understanding factor is inconsistent with the agency's cost realism

_____

[23]/ The rejection of Palmetto's proposal, given its lower ratings and higher price, would also still have occurred.

33

analysis; and, (3) Noridian's Audit and Reimbursement assumptions were far worse than FCSO's, and thus should have been noted as a weakness, but were not.

The court turns first to plaintiffs' arguments which focus on the SME's judgment that FCSO made three inaccurate assumptions in its Audit and Reimbursement plan. CGS expresses disagreement with the SME's criticism of FCSO's plan. *See* CGS Mot. at 35 n.14 (suggesting that one of FCSO's assumptions was sufficiently accurate as an estimate); CGS Reply at 26-27 (arguing that FCSO's assumptions reflect estimates that the agency has "accepted" in the incumbent Jurisdiction 1 contract). Palmetto, for its part, suggests that the SME's criticism of FCSO's Audit and Reimbursement plan was unsupported, conclusory, and opaque. Palmetto Mot. at 36-38. Palmetto asserts, in particular, that the SME's criticism of FCSO's assumptions "was unsupported by any alternative workload assumptions." *Id.* at 35.

Defendant notes that the TEP, relying upon the SME's advice, concluded that "[t]he sum of these three [inaccurate FCSO] assumptions . . . evidenced a risk that an important aspect of the contract – fraud prevention – might not be fully accomplished." Def.'s Mot. at 43. Noridian, Noridian Mot. at 42, points to the TEP's concern that there were risks in FCSO's Audit and Reimbursement plan:

> The TEP agrees with the . . . SME that these assumptions are not realistic and pose the risk that Cost Reports will not be settled accurately, resulting in inappropriate payments to institutional providers. This demonstrates a weakness in its technical approach that may result in lower quality of work and poor stewardship of trust fund dollars.

AR at 5228. Both the government and Noridian argue that it was reasonable for the SME to criticize FCSO's assumptions in its Audit and Reimbursement plan, in light of the explanatory text of the proposals CGS and Palmetto submitted to the agency.[24] Def.'s Mot. at 41-42; Noridian Mot. at 43.

_____

[24]/ Neither plaintiff provided record cites to the court which would have identified the pages which contain the challenged assumptions in FCSO's Audit and Reimbursement plan. Plaintiffs' contentions that these assumptions are accurate lack persuasive force, because, among

continue...

Although plaintiffs would prefer that this court substitute its judgment for that of the SME and the TEP, such a course of action is not proper. *E.g.*, *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) (*Alabama Aircraft*) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The contemporaneous record of this procurement shows a rational basis for the concerns expressed by the SME and the TEP. The court therefore defers to the agency's expertise in this regard.

CGS and Palmetto also argue that the weakness assigned to FCSO's Audit and Reimbursement plan (for having inaccurately underestimated certain tasks) is inconsistent with the agency's cost realism analysis. *See* CGS Mot. at 35; Palmetto Mot. at 38-39. Plaintiffs note that FCSO's proposed hours of work for Audit and Reimbursement *exceeded* the SME's estimate, and that the BEP made *no adjustment* to the hours proposed by FCSO for this function. While there is a superficial attractiveness to this argument, it rests on the premise that an adequate estimate of total Audit and Reimbursement *hours of labor* necessarily validates every assumption in FCSO's Audit and Reimbursement plan as to *expected tasks*. Defendant suggests that plaintiffs are comparing apples to oranges, because the technical understanding weakness was not questioning the number of hours proposed by FCSO, but the "level and depth of audits and payment dispute resolution." Def.'s Mot. at 42. Defendant's point is well-taken. It was not irrational for the agency to find a weakness in FCSO's assumptions as to Audit and Reimbursement tasks, while at the same time approving FCSO's estimate of total hours needed for Audit and Reimbursement labor.

Finally, plaintiffs suggest that because Noridian's assumptions as to Audit and Reimbursement total hours were adjusted by the BEP, Noridian should also have received a weakness under the technical understanding factor for its Audit and Reimbursement plan. CGS Mot. at 35-36; Palmetto Mot. at 39-40. Plaintiffs note that FCSO's total hours projection exceeded the SME's estimate, whereas Noridian's proposed total hours for Audit and Reimbursement fell short of that estimate. Furthermore, Palmetto suggests that Noridian "made several other unreasonable . . . assumptions regarding the Audit and Reimbursement workload."

---

[24]/ ...continue
other reasons, plaintiffs have not provided the necessary factual underpinnings for their arguments.

Palmetto Mot. at 40. Plaintiffs thus contend that Noridian received unjustifiably better treatment in the evaluation of its Audit and Reimbursement plan.

As discussed *supra*, an adjustment to Noridian's Audit and Reimbursement proposed hours is not necessarily synonymous with a weakness in its technical understanding of Audit and Reimbursement tasks. As defined in the SSP, a weakness is "a flaw in the proposal that increases the risk of unsuccessful contract performance." AR at 2294. As defendant explains, CMS could rationally find a risk in the inaccurate assumptions in FCSO's Audit and Reimbursement plan, but no risk in Noridian's low estimates for certain labor hour categories in its Audit and Reimbursement plan. *See* Def.'s Reply at 17 ("[A]lthough Noridian underestimated the time needed to accomplish certain tasks, F[CS]O underestimated the complexity and depth of the tasks involved.").

Plaintiffs' burden is to show that the evaluation of Noridian's Audit and Reimbursement plan was arbitrary or irrational. The court finds that CMS rationally assigned a weakness to FCSO's Audit and Reimbursement plan, and rationally did not assign a weakness to Noridian's Audit and Reimbursement plan.[25] In other words, plaintiffs have failed to show that the TEP erroneously evaluated Noridian's Audit and Reimbursement plan as meeting the contract requirements set forth in the RFP. For all of the above reasons, the court does not find that the agency's evaluation of the offerors' Audit and Reimbursement plans under the technical understanding factor was arbitrary or capricious.

### 4. A Dedicated CERT Coordinator, and Other Medical Review Issues

CGS attacks the agency's technical understanding ratings on a multitude of fronts, and groups some of its arguments related to the evaluation of personnel and program strategies under this heading: "The CMS Medical Review Strategy and CERT Reduction Plan Evaluation Was Arbitrary and Unequal." CGS Mot. at 28. The basic thrust of these arguments is that CGS proposed good strategies and equivalent personnel solutions in these areas, yet its proposal received weaknesses

---

[25]/ Palmetto notes a particular instance of an inaccurate assumption in Noridian's Audit and Reimbursement plan. Palmetto Mot. at 40 (citing AR at 11032). The record page cited does not indicate, however, that a weakness in technical understanding should have been assigned to Noridian for this single inaccurate assumption. *See id.*

where Noridian received strengths. *Id.* at 28-31. The court begins with an overview of the proposal features (and terminology) at issue in these alleged evaluation errors.

### a.    Medical Review and CERT Defined

Medical Review is described by the agency in the following manner:

> Medical review and local provider education and training. The . . . MAC will reduce the claims payment error rate by identifying, through analysis of data and evaluation of other information, program vulnerabilities concerning coverage and coding made by individual providers; and by taking the necessary action to prevent or address the identified vulnerabilities.

AR at 129. The RFP introduced its extensive discussion of Medical Review with this statement: "The Contractor shall decrease the paid claims error rate and address Medical Review (MR) –related coverage, coding, and billing errors . . . ." *Id.* at 425. The MAC for Jurisdiction E was required to "develop a problem-focused, outcome-based [Medical Review] strategy." *Id.* Thus, although Medical Review has many aspects, the primary goal appears to be reducing the Medicare "claims payment error rate." *Id.* at 129.

A related term is "Comprehensive Error Rate Testing (CERT)." AR at 428; *see also id.* at 485 (alternatively described as Compliance Error Rate Testing). This is just one source of data that is used in a Medical Review strategy. *Id.* at 426. The RFP contains a description of CERT:

> CMS has developed the CERT program to produce national, Contractor-specific, and service-specific paid claim error rates. The program has independent reviewers who identify random samples of Medicare claims when they enter the claims processing system. The independent reviewers review the selected claims after they are paid or denied to ensure that the decision was appropriate. The outcome of the review is a provider compliance error rate and paid claims

error rate. The CERT Contractors are responsible for operating the CERT operations center and for gathering information from the [MAC] Contractor.

*Id.* at 428.

Reduction of CERT rates is a priority for CMS, and one closely-related priority is the reduction of fraud and abuse in Medicare claims, which can contribute to high CERT rates. AR at 304-05, 427; Def.'s Mot. at 43. Jurisdiction E contains California, a state identified in the RFP as an area of high Medicare fraud and abuse. AR at 457. Thus, the TEP closely scrutinized the offerors' proposals as to their Medical Review strategies and CERT reduction plans.

### b. TEP Ratings for Medical Review and CERT Reduction

Two weaknesses were assigned to CGS in this area. The first criticized CGS's CERT reduction plan:

[ ].

AR at 5201. Although the parties dispute the robustness of CGS's CERT reduction plan, after consideration of these arguments and the text of CGS's proposal, the court finds nothing irrational in the weakness assigned by the TEP to CGS's CERT reduction plan. In the absence of any error of fact in the TEP report, the court must defer to the technical expertise of the agency in this evaluation finding.

CGS also received a weakness for its Medical Review strategy. The TEP report concluded that:

[ ].

AR at 5201. This weakness contributed to CGS's "numeric score of .6 for the Technical Understanding factor." *Id.* at 5202.

CGS argues that its Medical Review strategy contained a large number of specific approaches that controvert the TEP's conclusion that CGS's Medical

38

Review strategy "was very general in nature." AR at 5201. There are indeed eighteen pages of Medical Review strategy in the CGS proposal, AR at 3444-61, but the court must agree with defendant that CGS's challenge to the weakness it received for its Medical Review strategy "amount[s] to no more than a disagreement with the agency's exercise of its expertise and discretion in evaluating the [offerors'] respective approaches to reducing Medicare fraud" and other claims payment errors, Def.'s Mot. at 43. Both the TEP and the SSA found a weakness in CGS's Medical Review strategy, AR at 5201-02, 13899, and provided a coherent and rational explanation for this finding; the assignment of this weakness has not been shown to be irrational.

Furthermore, the court sees nothing arbitrary or capricious in the agency's largely negative review of the Medical Review strategy in CGS's proposal and the largely positive review of the Medical Review strategy in Noridian's proposal. These are highly technical evaluation rating decisions to which the court must defer. Having found no error of fact or reasoning in the TEP report or the SSM, the court finds that CGS has not met its burden to show that the agency's evaluation of its Medical Review strategy and its CERT reduction plan was irrational.

### c. Allegedly Disparate Treatment of a Dedicated CERT Coordinator in the Proposals Submitted by CGS and Noridian

CGS relies heavily on the fact that its proposal contained a reference to a dedicated CERT Coordinator, whereas only Noridian received a strength for offering a dedicated CERT Coordinator. CGS Mot. at 29-30. It is certainly true that both proposals identify personnel with the title CERT Coordinator. *Compare* AR at 2369 *with id.* at 3460-61. The parties engage in a cumbersome analysis of the Medical Review strategies proposed by CGS and Noridian in an attempt to identify how many positions in each proposal were devoted to CERT Coordinator-related activities. There are only two valuable insights to be gained from this debate: (1) there are some differences in the constellation of staff positions proposed by each offeror for Medical Review functions; and (2) the roles of these staff persons are variously described.

The TEP accorded Noridian a strength for its dedicated CERT Coordinator:

39

The TEP assigned a separate strength to the Offeror's proposal to employ a dedicated CERT Coordinator to perform [ ]. This will allow [Noridian] to better analyze claim aberrancies and identify payment vulnerabilities. In addition to the coordinator position, the Offeror proposes [ ] above what CMS requires and demonstrates the Offeror respects the importance attached to being an accountable steward of Medicare trust fund dollars.

AR at 5192-93. The TEP also noted a similar strength in Noridian's Medical Review strategy, for proposing "a Medical Review Manager fully dedicated to the JE contract, again demonstrating the Offeror's awareness of Agency priorities, i.e. reducing the CERT error rate in Jurisdiction E and addressing the high incidence of fraud and abuse in this jurisdiction through the MR program." *Id.* at 5192.

The court finds nothing irrational or unequal in the award of these related strengths to Noridian's proposal. The TEP clearly reasoned that the personnel, and roles for those personnel, in Noridian's proposal exceeded contract requirements for Medical Review. Although CGS insists that its proposal contained substantially similar personnel features that should have been awarded a strength, defendant persuasively argues that "CGS and Noridian . . . proposed different approaches to these personnel, which supports the contracting officer's decision to treat them differently." Def.'s Mot. at 45. The TEP report contains a rational explanation of the strengths accorded Noridian in this regard, and justifiably omitted mention of features in CGS's proposal which simply met contract requirements.

The court concludes that CGS has not shown that its proposal deserved a strength for the dedicated CERT Coordinator that CGS proposed. Having found no error in the TEP's analysis of Medical Review strategies, CERT reduction plans, or CERT Coordinator functions, the court will not disturb the technical ratings Noridian and CGS received in these areas. The SSA's reliance on these ratings for her best value award decision, AR at 13899, 13909-12, was therefore unobjectionable.

**5.    [ ] versus EXACT**

40

CGS asserts that it offered several "technologies for . . . managing workflow" that were similar to those offered by Noridian, yet the TEP awarded strengths only to Noridian and criticized CGS for its lack of "'technical solutions to manage the workload.'" CGS Mot. at 32 (quoting AR at 5202). As the primary underpinning for its argument, CGS suggests that its [ ] was similar to Noridian's EXACT product.[26] CGS also asserts that it offered a number of other technologies, such as [ ], that should have earned CGS a better technical understanding rating. *Id.* at 33-34; CGS Reply at 22-24. In CGS's view, the disparate ratings of technologies reflect disparate treatment.

Defendant and Noridian respond that there was nothing irrational in the TEP's ratings of the technologies of the two offerors. Def.'s Mot. at 47-48; Noridian Mot. at 40-41. The court finds that [ ] and EXACT, upon review of the record and the arguments of the parties, are sufficiently different to justify the distinctions drawn by the TEP in the technical understanding findings and ratings for CGS and Noridian. *Compare* AR at 2500-01 *with id.* at 3432-33. Furthermore, the agency's expertise as to the relative value of these technologies is entitled to deference. *See, e.g.*, *Omega World Travel*, 54 Fed. Cl. at 578 ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss*, 77 F.3d at 449)). As to the other technologies offered by CGS, the record does not show that these products are of such similar utility to those offered by Noridian that the TEP ratings for CGS's proposed workload processing technologies were infirm.[27] The court finds no error in the agency's findings regarding the technologies proposed by CGS and Noridian.[28]

---

[26] EXACT does not appear to be an acronym.

[27] To cite one example, CGS complains that Noridian should not have received a strength for the automation of claims processing if CGS did not receive a strength for [ ]. CGS Mot. at 33-34. But the strength awarded to Noridian was for EXACT's ability "to automate the claims suspense process," whereas the description of [ ] in CGS's proposal does not mention this particular feature. *Compare* AR at 3435 *with id.* at 5193; *see also id.* at 2509-10 (offering a detailed description of the proposed innovation of "Claim Suspense Process Automation"). The court sees no error in the strength awarded to Noridian for its proposed innovation in claims processing.

[28] Although CGS complains that not all of its technologies were discussed by the TEP, CGS Mot. at 33 n.13, 34, there was no requirement that the TEP comment on every feature

continue...

### 6. Business Rules Engines Proposed By Noridian and CGS

In a similar vein, CGS argues that its "Business Rules Engine" was the equivalent to the one proposed by Noridian, and that its business rules engine should have received a strength in the TEP's technical understanding evaluation. CGS Mot. at 32-33; CGS Reply at 23. The parties' arguments in this regard note that Noridian's business rules engine was integrated and functioning as part of EXACT, whereas CGS's business rules engine had not yet been implemented. *See* AR at 3439. Having considered the parties' arguments in this regard, and the proposals that were before the agency, the court finds nothing irrational in the strength awarded to Noridian for the functionality of EXACT and its integrated business rules engine. *See id.* at 5193.

### 7. Technical Understanding Ratings Summary

CMS has conceded one error in its rating of Noridian's technical understanding, that of the strength awarded to Noridian for integrating Medicare Summary Notices (MSNs). That error, however, was not prejudicial to plaintiffs. The other challenges to the agency's technical understanding evaluation, as discussed above, have not identified any flaws in that evaluation, under the deferential standard of review applicable to an agency's evaluation of highly technical proposals. The court therefore rejects this category of protest grounds as justifying any of the relief requested by plaintiffs.

### E. Cost Adjustments

The agency was required by the FAR to adjust, where necessary, the proposed costs of the offerors' proposals to arrive at the probable costs of the proposals. *See* FAR 15.404-1(d)(2). All of the offerors' proposed costs were adjusted upward. Not surprisingly, plaintiffs argue that their probable costs were unjustifiably inflated, whereas Noridian's costs were not raised enough to reflect Noridian's probable costs. The court will examine plaintiffs' principal arguments

---

[28]/ ...continue
mentioned in an offeror's proposal. *See supra*.

in this regard,[29] but notes at the outset that the adjustments of an offeror's costs to reflect probable costs is a highly technical endeavor. As long as there is a rational explanation in the contemporaneous record for the cost adjustments performed by CMS, the court will not second-guess the agency's highly technical cost adjustment decisions. *See, e.g.*, *Electro-Methods*, 7 Cl. Ct. at 762 (noting the need for judicial restraint when this court reviews highly technical procurement decisions).

## 1.    Provider Enrollment Productivity

The MAC in Jurisdiction E will be responsible for enrolling providers into the Medicare program. AR at 369-71. One of many steps in this process is the entry of information into PECOS (Provider Enrollment, Chain Ownership System), which is a CMS system. *Id.* at 369. The cost of the provider enrollment function varies based on the number of provider enrollment applications the MAC can process per day, a rate which the parties refer to as the productivity rate.[30] An adjustment *lowering* an offeror's proposed productivity rate, which the BEP determined was necessary for each of the offerors in this procurement, results in an *increase* in the offeror's probable costs (more hours of labor are required, for example) for the contract. As stated *supra*, plaintiffs argue that the adjustments to the offerors' proposed productivity rates were not reasonable.

As a threshold matter, the court surveys the information relied upon by the agency to make cost adjustments to the provider enrollment productivity rates. First, the offerors provided their proposed productivity rates. For Noridian, this rate was [ ] applications per day. For FCSO, the subcontractor for both CGS and Palmetto, this rate was [ ] applications per day. Second, the agency had Noridian's self-reported historical productivity rate of [ ] applications per day. FCSO did not self-report its historical productivity rate, but stated that its proposed productivity

---

[29] CGS devoted nine pages of its opening brief and eleven pages of its reply brief to three distinct cost adjustment challenges. Palmetto was more restrained in the number of its cost adjustment challenges, but it, too, devoted a substantial number of pages to its cost adjustment arguments. The court has considered all of these arguments (and their sub-parts), and finds them to be unavailing. This opinion section attempts to address each substantive challenge to the agency's cost realism analysis.

[30] Only the productivity rate for Medicare Part B provider enrollment is at issue in this bid protest.

rate was "based upon actual MAC J1 experience adjusted for enhancements to the provider enrollment process as outlined in the RFP and FCSO initiated process improvements." AR at 4410. Third, the agency's experts (the SME and the TCA) provided an average provider enrollment productivity rate of 12 applications per day, derived from national data but weighted to reflect the workload in Jurisdiction E. *Id.* at 11303. Fourth, the agency possessed information that efficiency gains attributed to RapidApp, the technological innovation proposed by Noridian to improve its historical productivity rate, were diminished because of changes to PECOS.[31]

Although the parties strongly dispute the methodology utilized by the BEP to arrive at probable productivity rates for the offerors, the record is clear that Noridian and FCSO were both determined to have a probable provider enrollment productivity rate of 12 applications per day. The court will consider first whether the agency committed the error alleged by plaintiffs, *i.e.*, that CMS substituted a "should have bid" productivity rate for an adequately supported FCSO-specific productivity rate, an error that CGS refers to as the improper normalization of proposed costs. *See* CGS Mot. at 17 (citing *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 509, 512 (2005)). The court will then consider whether the 12 applications per day probable productivity rate assigned to Noridian was irrational, because of improper normalization or other flaws in the agency's cost realism analysis.

### a. FCSO's Provider Enrollment Productivity

Plaintiffs argue that FCSO, a national leader among MACs in provider enrollment, adequately substantiated its proposed productivity rate of [ ] applications per day for Jurisdiction E. Plaintiffs note further that productivity rates vary widely between MACs. *See* AR at 11302, 11861, 15871. Thus, plaintiffs argue, it was improper and irrational to substitute an average productivity estimate for FCSO's proposed productivity rate.

Plaintiffs also point to the enhancements FCSO proposed to improve its historical productivity rate. One of these enhancements is its [ ], instituted in 2008.

---

[31]/ RapidApp is discussed at some length in the section of this opinion devoted to plaintiffs' challenges to the agency's evaluation of the offerors' technical understanding. *See supra*.

AR at 3434, 4401. [ ] was reported to have cut hours in provider enrollment in Jurisdiction 1, and further efficiencies involving [ ] were predicted. *Id.* [ ] received positive commentary in an email composed by the SME. *See id.* at 12389 ("[ ].").

Defendant and Noridian argue, however, that CMS properly relied upon the agency's 12 applications per day estimate in determining FCSO's probable productivity rate. First, they point out that FCSO did not disclose its historical productivity rate for Jurisdiction 1, despite the warning in the RFP that CMS would not necessarily retrieve information that was not included in the offerors' proposals. Noridian Mot. at 7-8; Def.'s Mot. at 51 (citing AR at 278). Second, they argue, relying on the contemporaneous record of the BEP's cost realism analysis, that CMS did not possess historical productivity data for FCSO. *See* AR at 11303. Third, Noridian argues that the characterization of FCSO as a national leader in provider enrollment is not synonymous with an above-average productivity rate. Fourth, Noridian argues that [ ], in place since 2008, is already represented in FCSO's historical productivity rate and thus should not be construed as support for a higher-than-historical proposed productivity rate. Noridian Reply at 6. For all of these reasons, defendant and Noridian urge the court to find that the agency's decision to lower FCSO's productivity rate to the weighted average of 12 applications per day was reasonable.

The court concludes that CMS rationally considered the information available to it and determined that FCSO's proposed productivity rate was too high. Although the efficiency of [ ] was warmly praised by the SME, he also noted [ ]. AR at 12389. The TEP, which assisted the BEP in the cost realism analysis, reported that [ ] would not raise FCSO's productivity rate. The TEP's commentary in this regard is conclusory and does not capture every nuance of the SME's email, but it does not appear to the court that the TEP expressed an irrational conclusion as to FCSO's probable productivity rate:

> In the TEP's efforts to determine whether the proposed productivity rates are reasonable, it consulted with the PE SME. The subcontractor, First Coast Service Options, proposed an innovation in provider enrollment called [ ], however, the SME did not consider it a tool that would increase productivity but rather a tool to [ ] throughout the process. As a result, the TEP concluded there were

45

no innovations or other technical proposals to support the
Offeror's proposed productivity and therefore
recommends an adjustment that used the most recent
baseline numbers provided by the SME and calculating a
weighted average of those baseline numbers with which
to compare the proposed productivity.

*Id.* at 11303.

To the extent that the TEP failed to fully quote the SME's email, the court
finds this error to be *de minimis*. The SME *did not* opine that [ ] would raise
FCSO's historical productivity rates for Jurisdiction 1. The BEP reasonably
questioned the [ ] applications per day productivity rate proposed by FCSO, and
reasonably determined that 12 applications per day was FCSO's probable
productivity rate. The cost adjustments based on FCSO's probable productivity
rate for provider enrollment were rational, according to the record that was before
the agency and that is now before this court.

### b.      Noridian's Provider Enrollment Productivity

Noridian's proposal stated that, largely due to RapidApp, it would improve
its historical productivity rate from approximately [ ] applications per day to a
proposed productivity rate of [ ] applications per day. AR at 2502. The BEP
report acknowledged that Noridian proposed to process [ ] applications per day; the
agency then proceeded to determine whether that figure was reasonable. *Id.* at
11022. The BEP report noted "the TEP's uncertainty regarding when RapidApp
may be deployed in JE and to what extent." *Id.* The TEP decided that it could not
accept Noridian's proposed [ ] applications per day productivity rate. *Id.* After
considering available adjustment options, the weighted average of 12 applications
per day was adopted as "the preferred method." *Id.*

The parties review contemporaneous emails regarding RapidApp, which the
court has discussed briefly earlier in this opinion. The dominant opinion at CMS,
as expressed by the SSA, was that portions of RapidApp would continue to have
some utility. Although it is evident that the SME could not precisely quantify the
potential productivity gains attributable to RapidApp in Jurisdiction E, *see* AR at
11022 (stating that "the SME is unable to estimate a level of productivity savings
[from RapidApp] going forward"), it was not irrational for CMS to reduce

46

Noridian's proposed productivity rate, citing efficiencies largely attributed to RapidApp, from [ ] applications per day to 12 applications per day.[32]  Although the court (and certainly plaintiffs) might have calculated a different productivity rate for Noridian, plaintiffs have not shown that a productivity estimate of 12 applications per day was an irrational basis for the cost adjustment made to Noridian's proposal for provider enrollment.[33]  Plaintiffs' challenge to the cost adjustments made to the offerors' proposals for provider enrollment must therefore be rejected.  *See, e.g.*, *Honeywell*, 870 F.2d at 648 ("'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" (quoting *M. Steinthal*, 455 F.2d at 1301)).

## 2.    Noridian's Audit and Reimbursement Cost Adjustment

CGS argues that Noridian's Audit and Reimbursement costs, although adjusted upward, were not adjusted enough.  CGS Mot. at 21-22.  CGS relies in particular on an email from the SME which suggested that she used approximately 150,000 total Audit and Reimbursement hours to evaluate proposals.  Noridian proposed approximately [ ] hours for Audit and Reimbursement.  AR at 2743.  CMS adjusted those hours to approximately [ ] hours.  *Id.* at 11032.  CGS complains that Noridian's Audit and Reimbursement costs were not "properly increased."  CGS Mot. at 22.  In its reply brief, CGS argues that the BEP's total

---

[32]/ The SSA described this reduction in Noridian's productivity rate as a reduction of 50% in the "proposed productivity increase."  AR at 13895 ("[W]hen assessing the cost realism of [Noridian's] proposed productivity increases due to RapidApp, the TEP only accepted 50% of the proposed productivity increase.").  This, in the court's view, is not a mathematically accurate statement.  Noridian's proposed productivity increase was an additional [ ] applications per day (from [ ] applications per day to [ ] applications per day).  *Id.* at 2502.  The probable productivity increase determined by the BEP was an additional [ ] applications per day (from [ ] applications per day to 12 applications per day).  Thus, the BEP accorded Noridian a productivity increase of approximately [ ]% of its proposed productivity increase, not 50%.

[33]/ The court notes that the SME described provider enrollment as "a constantly changing area."  AR at 12389.  The court further notes that changes in PECOS were increasing the automation of provider enrollment.  *See id.* at 13828-29.  This evidence of instability and uncertainty in provider enrollment processes, in the court's view, supports the agency's reliance on an estimate based on a weighted average productivity rate produced by the SME and the TCA.

adjustment to Noridian's Audit and Reimbursement costs was "unexplained." CGS Reply at 12.

Defendant and Noridian contend that the individual cost adjustments to particular aspects of Noridian's Audit and Reimbursement proposal were reasonable. Defendant argues that the record provides a rational explanation for the adjustments made to Noridian's Audit and Reimbursement costs, and that the SME's 150,000 estimate for total labor hours should be viewed as a "presumptive baseline," rather than as a minimum acceptable threshold of labor hours for Audit and Reimbursement activities. Def.'s Mot. at 52; *see also* Def.'s Reply at 23-25. The court must agree with defendant, for the following reasons.

First, both CGS and defendant note that there were some disagreements between the Audit and Reimbursement cost adjustments proposed by the SME and those proposed by the TCA. *See, e.g.*, AR at 11033. Second, the Source Selection Plan did not require that the BEP adopt all SME recommendations. *See id.* at 2280-81. Third, the BEP considered the input of the SME but nonetheless adopted specific cost adjustments and a total cost adjustment recommended by the TCA. Upon review of the BEP report regarding Noridian's proposal, and after full consideration of the significance of the 150,000 total labor hours estimate produced by the SME, the court finds nothing irrational in the adjustments to Noridian's Audit and Reimbursement costs. In other words, the individual and total cost adjustments endorsed by the BEP were not rendered irrational by the higher total hours estimate provided by the SME. Although CGS complains that the adjustments for Noridian's Audit and Reimbursement costs are not adequately explained, the record is sufficiently clear to show the rationality of the agency's decision in this regard. *See, e.g.*, *Bowman*, 419 U.S. at 286 (stating that a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned") (citation omitted).

### 3.  CGS's Overhead and G&A Cost Adjustments

CGS's final argument regarding the agency's cost realism analysis is that CMS erred when it adjusted CGS's Overhead and General & Administrative (G&A) rates upward. CGS Mot. at 22-23; CGS Reply at 12-13. CGS acknowledges that its proposed rates were lower than some of its historical rates, but suggests that a larger business base would justify these proposed rates if CGS were awarded the Jurisdiction E MAC contract. CGS also contends that it

48

calculated its proposed rates by using the formula provided in the RFP. CGS therefore concludes that the cost adjustments for its Overhead and G&A were irrational.

Noridian argues that the agency employed "reasonable skepticism" in its review of CGS's proposed rates, and that CGS has not shown that this skepticism was irrational. Noridian Mot. at 45-46. Defendant notes that CMS was cognizant of the business base increase inherent in CGS's proposal, but nonetheless fully explained why CGS would likely bill at higher rates than those proposed. Def.'s Mot. at 53-54. The question before the court is whether there is a rational explanation in the record for the adjustments to CGS's Overhead and G&A rates.

The court has reviewed the record pages cited by the parties that evidence the basis for the upward adjustment of CGS's Overhead and G&A rates. *See* AR at 11264-66, 11273-77. The BEP noted that CGS expected that a post-award expanded business base would decrease its Overhead and G&A rates. *Id.* at 11264, 11274, 11276. The BEP also noted, however, that CGS had recently billed at [ ] rates for Overhead and G&A. *Id.* at 11265, 11276. The BEP rationally concluded that a cost adjustment to CGS's Overhead and G&A rates was warranted.

Although CGS disagrees with the agency's factual analysis of the billing data highlighted in the BEP report, *see* CGS Reply at 13 (suggesting that CGS's billing history shows decreasing rates), CGS has not shown that the agency's reasoning was infirm. As for the agency's decision to adjust CGS's rates upward, the court defers to the agency's technical expertise in this regard. The court therefore sees no reversible error in the agency's cost adjustments to CGS's Overhead and G&A rates.

### 4. The SSA's Alternative Tradeoff Analysis

As a final note regarding the agency's cost realism analysis, the parties have debated the value of the SSA's alternative trade-off analysis. In the alternative trade-off analysis, the SSA stated that she would have been willing to pay a significantly higher price premium to obtain the advantages of Noridian's proposal, *i.e.*, the price premium represented by the difference between Noridian's adjusted costs and CGS's unadjusted costs. AR at 13911. CGS relies on a GAO decision for the proposition that such alternative analyses fail as a matter of law because they are "'unsupported by specific analysis.'" CGS Reply at 10 n.5 (quoting

*Boeing Co.*, B-311344, 2008 CPD ¶ 114, 2008 WL 2514171, at \*46 n.88 (Comp. Gen. June 18, 2008)). Noridian correctly notes that the *Boeing* decision is distinguishable on its facts, and cites another GAO decision which did not reject an alternative trade-off analysis as inconsequential. *See* Noridian Reply at 8 (citing *Noridian Admin. Servs., LLC*, B-401068.13, 2013 CPD ¶ 52, 2013 WL 427848, at \*4 n.9 (Comp. Gen. Jan. 16, 2013)). Although the court does not rest its decision in this bid protest on the SSA's alternative trade-off analysis, that alternative analysis clearly lends support to the court's conclusion that no prejudicial error occurred in this procurement.

**CONCLUSION**

The court has considered all of plaintiffs' challenges to the SSA's award decision, and finds that no significant errors marred this procurement, except for one technical evaluation error which was not prejudicial to plaintiffs. This court will not substitute its judgment for the technical expertise of the agency in the absence of significant, prejudicial error. *See, e.g.*, *Alabama Aircraft*, 586 F.3d at 1376. The court concludes that the agency's best value award decision has not been shown to be arbitrary, capricious, an abuse of discretion, or contrary to law, and that the award of the contract to Noridian must stand. Because plaintiffs have not succeeded on the merits of their protest, the court need not consider whether the standard for injunctive relief has been met in this case.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiffs' Motions for Judgment on the Administrative Record, filed February 22, 2013, are **DENIED**;

(2) Defendant's and Intervenor-Defendant's Cross-Motions for Judgment on the Administrative Record, filed March 11, 2013, are **GRANTED**;

(3) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant, dismissing the complaint with prejudice;

(4) On or before **May 3, 2013**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets,

50

so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(5)     Each party shall bear its own costs.


/s/Lynn J. Bush
LYNN J. BUSH
Judge